This is an appeal from the assessment and levy of transfer inheritance tax in connection with the estate of James W. Johnson, deceased, who died testate, a resident of New Jersey, September 1st, 1932. It is submitted on brief, without oral argument.
On May 27th, 1930, a little more than two years before his death, testator made an inter vivos transfer to each of his two daughters, — the property thus transferred being the same in nature and amount in both instances, and each transfer comprising property of the value of $1,406,098.25, as of the date of the transfer, out of a total estate of about $5,000,000.
The commissioner determined that these transfers were made in contemplation of death and were therefore taxable. He determined that the tax in respect of these transfers should be computed and assessed on the basis of the value of the property transferred, as of the date of the transfer. He also determined that that portion of the tax which remained unpaid on and after September 1st, 1933 (one year after the death of decedent), was subject to interest at the rate of ten per cent. per annum from that date to the date of payment. The correctness of these three determinations is challenged by appellant, and the issues thus raised constitute the questions before the court on this appeal.
The appellant's contentions are, — (1) that the inter vivos
transfers were not made in contemplation of death, and hence are not taxable at all; (2) that if taxable, the tax should be computed on the value of the property at the date of death of the transferor instead of the value at the date of transfer; and (3) that interest should be charged at the rate of only six per cent. instead of ten per cent. *Page 346 
1. Taxability of the inter vivos transfers.
At the date of these transfers, May 27th, 1930, the transferor was seventy-four years of age. He had had a serious illness ten years earlier, in 1920, but had completely recovered therefrom, and there is testimony to the effect that at the time of these transfers he was, — and for the last nine years had been, — in excellent health, with strength, vigor and activity unusual for a man of his years, and a mental outlook corresponding. There is also some testimony and evidence tending toward a different conclusion as to his actual condition of health and his own belief in regard thereto, but for the purposes of the determination of this appeal, it will be assumed that there is nothing in the proofs to indicate that he did, or had any reason to, have any actual contemplation or apprehension of death as imminent or likely to occur in the not distant future, — or that he thought of death in any wise differently from that which would be natural in any other man of his age, in excellent condition of health and mind.
On this assumption, the situation in this respect in the instant case, would therefore differ from the situation which was present in such cases as Kunhardt v. Bugbee,3 N.J. Mis. R. 1107, 130 Atl. Rep. 660; In re Gould, 105 N.J. Eq. 598,148 Atl. Rep. 731; In re Grabfelder, *107 N.J. Law 520, 153 Atl. Rep. 532;Schweinler v. Martin, 117 N.J. Eq. 67, 175 Atl. Rep. 71,affirmed, 13 N.J. Mis. R. 722, 180 Atl. Rep. 774; In re Hartford,122 N.J. Eq. 489, 194 Atl. Rep. 800, affirmed, *122 N.J. Law 283,4 Atl. Rep. 2d 31; In re Fischesser, 14 N.J. Mis. R. 815,187 Atl. Rep. 648.
The absence of any actual contemplation or apprehension of death as imminent or not unlikely to occur in the not distant future, does not by any means necessitate a finding that the transfers were not made in contemplation of death according to the intent and meaning of the statute. Schweinler v. Martin,supra, at p. 87; Perry v. Martin, infra. Compare also U.S. v. Wells, 283 U.S. 102 at 119, — "It is sufficient if contemplation of death be the inducing cause of the transfer, whether or not death is believed to be near."
Neither is it requisite that there be found a conscious intent *Page 347 
to escape the tax. Moore v. Bugbee, 3 N.J. Mis. R. 435,128 Atl. Rep. 679; Kunhardt v. Bugbee, supra; Schweinler v.Martin, supra.
The language of the statute is "in contemplation of death," — not "in apprehension of death." A transfer may be taxable as being made in contemplation of death, notwithstanding an entire absence of any apprehension of death, either as imminent, or likely to occur in the near future, or not unlikely to occur in the not distant future, — notwithstanding that the transferor's actual contemplation of death was nothing more than that it was a thing which was bound to occur at some time but which there was no reason to suppose as being likely to occur for an indefinite number of years in the future. "Contemplation of death," as used in the statute, means simply that same kind of contemplation of death which leads to, and results in, the making of a will or a codicil to a will. Schweinler v. Martin, supra; Perry v.Martin, infra; Scheider v. Martin, infra.
The intent and meaning of the statute is that those transfers shall be taxable "which are made with the intent and purpose that they take the place of testamentary disposition, — irrespective of the donor's belief as to the probable nearness or distance of his death." Schweinler v. Martin, supra, at p. 90; Milliken
v. U.S., 283 U.S. 15, at 23. Wherever the donor has made a considered choice in favor of a present gift, between benefaction by will and benefaction by present gift, that gift has been the result of that contemplation of death which leads to testamentary disposition — and has therefore been made "in contemplation of the death of the donor" within the meaning of the statute. Id., at p. 97. To the same effect also is Scheider v. Martin,127 N.J. Eq. 323, 13 Atl. Rep. 2d 223; affirmed,124 N.J. Law 567, 12 Atl. Rep. 2d 678; and the still more recent opinion of the Supreme Court in Perry v. Martin,125 N.J. Law 46, 14 Atl. Rep. 2d 266.
In the case at bar, it appears that Mr. Johnson, aged seventy-four, had conceived an affection for a Miss McBain, aged thirty-five, (who had at one time been in his employ as a nurse), and purposed to marry her; his assets at that time *Page 348 
amounted to approximately $5,000,000 in value; his two daughters, Mrs. Carpender and Mrs. Rutgers, were strongly opposed to such marriage, believed that Miss McBain only desired to get his money, feared that if the marriage took place he might come under her domination or influence to such an extent as to result in his giving or bequeathing to her his entire estate; they so expressed themselves to their father and tried to dissuade him from the marriage; this resulted in friction and strained relationship between father and daughters.
In, and because of, this situation, Mr. Johnson devised and consummated the following plan: — Of his said assets he transferred to his two daughters, (half to each) securities and property worth at that time about $2,800,000; each daughter contracted in writing to pay to him $20,000 a year for the rest of his life, and pledged with a trustee ample collateral, (not being any part of the assets then transferred by him), as security for the performance of this obligation, and also assigned and conveyed all the property then and there conveyed to her by her father, to a trustee under an agreement of trust whereby there was to be paid to her during the life of her father the sum of $40,000 annually out of the net income, any balance of income being added to principal, and after her father's death, the whole net income was to be paid to the daughter during her life. The trust agreement further provided (in substance, briefly stated) that after the death of the daughter, the income was to be paid to her issue, in equal shares, per stirpes, until their respective attainment of age twenty-five or earlier marriage, in which events they were to receive their respective shares of principal; if the daughter should die without issue her surviving, the principal should go to her testamentary appointees, and in default of such should go to her next of kin and heirs at law.
Shortly before he made these transfers, he made the statement to a friend that he planned to give his daughters a substantial part of his estate so that he could do as he pleased from then on. Immediately after signing the transfers he said to his daughters, "You girls are now perfectly independent and I am free to live my own life as I see fit." *Page 349 
A month after the transfers to the daughters, Mr. Johnson transferred securities of about $100,000 to a trustee in trust for Miss McBain for life, with remainder to her issue, and divers provisions over in default of such issue. He married her in December, (the marriage having been postponed because of appendicitis and operation which befell him in September).
In April, 1931, he executed a new will, by which he gave bequests of no great amount to divers legatees, gave his household effects, automobiles, and $400,000 to his wife, and his residuary estate to his two daughters or their issue. About a year later he executed another will, substantially similar in its provisions.
At the time of the 1930 transfers he had a will, executed a few years earlier. The contents of this will do not appear in the record, but in view of the fact of his transfers to his daughters in 1930 notwithstanding the friction which had then developed; that he made them beneficiaries in his subsequent wills of a residuary estate amounting to about $1,000,000 (as compared with about $500,000 to his wife); and that he had made to them, on several occasions between 1911 and 1928, gifts aggregating about $1,600,000, — there cannot be any doubt but that they were the beneficiaries of practically his entire estate, — at any rate for their lives, — under the earlier will; and this is tacitly admitted by appellant.
There is no dispute concerning the facts. Most of those just recited are set forth, — and relied upon, — in the brief of appellant.
It is argued by appellant that these facts conclusively prove that the transfers in question were not made in contemplation of death; that they were made "entirely irrespective of that contemplation of death which leads to testamentary disposition;" that "they were motivated by purposes associated with life rather than with death;" that the transferor's "purpose was to attain an object desirable to him during his life, as distinguished from the distribution of his estate at death" and "to quiet the fears of his daughters that Miss McBain was seeking his money and might get it, by *Page 350 
making them financially independent beyond recall by her or by him;" that his purpose was "to avoid family conflict and the risk of having the ownership of the transferred properties interfered with by his marriage;" that his purpose was to accomplish a marriage without having financial disputes incident thereto and "to assure his daughters that the property transferred to them would not be lost to them through his marriage."
It should perhaps, be noted that each of the daughters testified specifically that the decedent's purpose and motive in making the transfers was "partly to make provision for our financial independence and partly because of his contemplated marriage with Miss McBain in order that we should not in any way have any complaint because of money matters." The two executors also made affidavit to the same effect. In view of the fact that, prior to the transfers, each daughter already had an independent personal estate of her own, of somewhere between $500,000 and $1,000,000, with an annual independent income of over $50,000 (exclusive of the very considerable incomes of their respective husbands), it is indeed difficult to believe that the transferor was induced to make the transfers by a desire to make his daughters "financially independent," as that term is ordinarily understood; so difficult indeed that no such contention is seriously made in appellant's brief.
Consideration of all these several statements or contentions will disclose that they are not all sound, and that they do not constitute a consistent, logical whole.
It is obviously not true that the decedent's purpose in the making of these transfers was in order to attain or accomplish the marriage which he desired. They were in nowise necessary to accomplish the marriage. He could have married Miss McBain without making the transfers to the daughters. It is equally untrue that he made the transfers in order to make his daughters financially independent; they already were.
It is undoubtedly true that he was motivated to the making of these transfers by the desire to avoid family conflict and financial disputes; and by the desire to assure his daughters that they would not lose, as the result of his marriage, that *Page 351 
property which he so transferred to them, — to assure them that notwithstanding he married, they would still have, at his death, the benefit and enjoyment of the greater part of his property; possibly too by a desire to assure himself, also, of that fact. None of these desires or motives, however, are incompatible with, or disprobative of, the possibility that he was also actuated by that contemplation of death which leads to testamentary disposition, — that he determined to make the transfers in the place and stead of testamentary gifts.
On the contrary, that the transfers were deliberately made in the place and stead of testamentary disposition, and hence that they were made in and as the result of that contemplation of death which leads to testamentary disposition, is a necessary and inevitable conclusion from all of the facts and circumstances.
That the making of the transfers arose because of Mr. Johnson's contemplated marriage and the situation which thereupon developed, is clear and conceded. No other reason for the transfer is suggested or appears in the proofs. Although he had previously made large gifts to the daughters, he had made none of anything like this size, — and these constituted in the aggregate considerably more than half his entire estate; he had already made them not merely financially independent but wealthy, (entirely aside from the wealth and income of their husbands), and the daughters themselves say that they were in no need whatever of any additional gifts or financial assistance.
He knew that they objected to his marriage; that they believed Miss McBain was simply seeking his money; that they felt that his estate (or the great bulk of it) ought to come to them at his death and that they were afraid this would not occur if he remarried. Whether or not he concurred in the thought that they ought to get the bulk of his estate at his death, notwithstanding his remarriage, — (he had already provided this should go to them, by his existing will, executed prior to his thought of remarriage), — it is obvious that in any event he thought that by providing that they should still get it, notwithstanding his remarriage, he would either remove their disaffection for Miss McBain and *Page 352 
restore peace and harmony among all concerned, or that, at any rate, he would thereby remove any and all basis and foundation for any criticism, complaint or thought, (which could by any possibility be deemed justifiable or reasonable) on the part of his daughters or anyone else, that he had failed to treat his daughters as fairly or generously as he ought to have done.
Obviously he determined to make provision that the daughters should still get the bulk of his fortune notwithstanding his remarriage, — because he did so provide by making the transfers in question; and that he made this provision, — made these transfers accomplishing this result, — in order that the daughters should not in any way have any complaint about money matters (based on his marriage to Miss McBain), is expressly stated by the daughters themselves and by the executors.
Beyond question, before he determined to make this provision for the daughters by means of immediate inter vivos transfers, he must have considered the possibility of doing it by means of last will and testament. He knew that he had already provided by his will that the daughters should get the bulk of his estate; he knew that, although he would want to make provision in his will for his new wife, he could do that and still provide in his will that his daughters should get the bulk of his estate; he knew that his daughters did not need and did not want to have him make present gifts to them, — that all that they wanted was that they should get the bulk of his estate at his death, but that they (and perhaps he, himself, also) did want to be sure of that; and he knew that a will could be destroyed or changed, and that if he should make a will with provisions which would be satisfactory to his daughters, there would be no assurance to his daughters (or to himself) that he might not subsequently be persuaded (by his new wife or otherwise) to change his will to the detriment of his daughters. The only practical way in which they (and he) could be sure that they would get the bulk of his estate, was to give it to them now.
He considered the two methods of accomplishing the disposition of the post mortem ownership, and enjoyment of his *Page 353 
estate and made a deliberate choice in favor of the present gift in the place and stead (pro tanto) of the testamentary disposition which he had already theretofore provided or in the place and stead of such testamentary disposition as he would have made in a revision of that will, — (revised in order to provide some benefaction for his new wife). Under such circumstances, and under the authorities in this state, the inter vivos gift was made in contemplation of death, within the meaning of the statute, — as has already herein been pointed out.
(It may be said that a present transfer was not the only method of assuring the eventual receipt of the estate by the daughters, — that decedent could have made a binding contract to leave it to them by will. It is quite possible that decedent may have considered this, but decided against it because of doubt as to the unimpeachable validity of such a contract, made upon only some colorable consideration, and the impracticality of accomplishing a real and unassailable consideration, — or doubt that the daughters would feel sufficiently assured by the making of such a contract. In any event, it is obvious that he did choose the method of the present gift instead of that of testamentary disposition.)
The facts and circumstances thus far considered are sufficient, without more, to establish that the transfers were made in contemplation of death. There are however two other circumstances which would necessitate the same conclusion, — and this, even if there were nothing in the case about either the earlier will or the purposed remarriage and the situation arising therefrom.
The first of these is that the decedent, as a part of the transaction, required each daughter to bind herself and her estate (and with collateral security), to pay to him $20,000 annually for the rest of his life. Clearly, then, in his deliberations prior to the making of the transfers, he had considered whether or not he would have, if he should make the transfers of considerably more than half his estate, sufficient income thereafter to fulfill his needs and desires for the remainder of his life. That consideration necessarily must have been substantially to the following effect, — "I want my daughters *Page 354 
to have the bulk of my estate. I can give it to them now, but if I do I won't have as much income as I want to have for the rest of my life. I can wait and give it to them by will at my death, and thus have the income I want for the rest of my life; but there are certain reasons why I would like to give it to them now. Let me calculate, — I have about $5,000,000 now, which brings me in an income of (so much). I ought to have an income of (so much) for the rest of my life. If I give my daughters (such and such) property it will amount to about $2,800,000 and leave me about $2,200,000, which will bring me in an income of only (so much) which is not as much as I want, and may be still further reduced in this depression. However, if I have each daughter pay me $20,000 a year, — which will be much less than the income she will get from the property I give her, — I'll be sure to have as much income as I will need or want for the rest of my life. So that is what I will do."
This again establishes that there was a deliberate and considered choice between present gift and testamentary disposition.
In the second place, the simplest and most natural thing for Mr. Johnson to have done in order to accomplish the certain ownership of the property in question, by the daughters at his death, (they being in no present need thereof nor of the income therefrom), would have been for him to have made a deed of trust with provision for the payment of the income (or a portion thereof) to himself for life, and with remainder over to the daughters at his death. It is evident that he had the assistance and advice of competent legal counsel in the consideration and consummation of what he should do in this regard, — both from the phraseology and contents of the several instruments which comprised the transaction in question, and the fact that they are all signed, as witness, by the individual who had been his personal counsel for several years prior thereto. That this simple method of the deed of trust was considered, there can be no doubt; because the method which was adopted was only a more complicated method of accomplishing substantially the same main, desired result. *Page 355 
We have not far to seek, to find the reason why the more complicated method was chosen. It had been established in this state for a considerable number of years prior to these transfers, that a conveyance inter vivos, either direct or by deed of trust, whereby there was reserved to the grantor for his life, the income or enjoyment of the property so conveyed, constituted a transfer intended to take effect in possession or enjoyment at or after the death of the transferor, and was taxable as such. See In re Honeyman, 98 N.J. Eq. 638, at 639,129 Atl. Rep. 393. In and by that case, — determined in 1925, five years before these transfers, — it was held that where a transfer was made which was immediately effective as to ownership and possession, it would likewise be taxable, if the transferor was to receive for life interest on the sum transferred or receive the income (or a part thereof) from the property transferred; but that this would not be so, if as consideration for the immediately and fully effective transfer there was an agreement to pay to the transferor for life payments not arising out of, or identifiably tied up with, the very property actually transferred. This was affirmed by the Supreme Court; and thereafter by the Court of Errors and Appeals, — sub nom.Bugbee v. Board of Home Missions, c., *103 N.J. Law 173,134 Atl. Rep. 915, in 1926, four years before these transfers. See also In re Harvey, 2 N.J. Mis. R. 247, 129 Atl. Rep. 393;affirmed, sub. nom. Moore v. Bugbee, 3 N.J. Mis. R. 435,128 Atl. Rep. 679; affirmed, *102 N.J. Law 720, 135 Atl. Rep. 919, —all decided not later than 1926.
There can be no doubt that these determinations and their application to each of the several possible methods of accomplishing the transfers which Mr. Johnson had in mind, formed a part of the deliberations of himself and his counsel. There is no other rational explanation for the selection of the more complex method of transfer instead of the simpler and more natural method. It will be observed that the transaction finally determined upon carefully avoids, in providing for the receipt of life income to the transferor, any provision for the payment of interest as such on the value of the property transferred; takes care that such life income is made *Page 356 
payable not out of the property transferred or out of any income therefrom, but entirely separate and distinct therefrom; takes care even that the amount of income to be received by the transferor is not equivalent in amount to that which would be the amount of normal and usual interest on the property transferred, or the normal amount of income derivable therefrom.
The conclusion is inescapable that the simpler method of accomplishing the desired results was rejected because it was recognized that a transfer in that form would be held taxable as a transfer intended to take effect in possession or enjoyment at or after the transferor's death. It is obvious that it was desired, if possible, to put through the transaction in some form and method which had not been made taxable by the statute — (this is of course not subject to criticism); but while the method chosen apparently avoids taxability as a transfer intended to take effect at death, it does not escape taxability as a transfer made in contemplation of death. On the contrary it establishes a conscious endeavor to avoid the operation of the statute; it establishes an intent and endeavor to accomplish by a method not taxable, a transfer which as a practical matter produces results substantially similar to those which would be obtained by a present transfer of remainder with reservation of income for life, or by testamentary transfer; it establishes, therefore, that the transfer was consciously and intentionally made in the place and stead of testamentary disposition, — and hence is taxable as being made in contemplation of death.
Finally, there is the conclusion necessarily and inevitably resulting from a consideration of the provisions of the deed of trust (comprising the very property transferred) which was made by each daughter contemporaneously with the transfer from her father to her, — and obviously forming a part of the transaction as a whole. This provided that there be annually paid to the daughter $40,000 of the income, during the father's life, and after his death the whole of the income during her life; with further divers provisions as to the disposition of income and principal after her death. Being a part of the single, whole transaction, this deed of trust obviously *Page 357 
constitutes a disposition made by Mr. Johnson, of his property. By the whole transaction he effectuated a transfer of his property from himself to the trustee and ultimately to the various persons, at the various times and in the various shares or interests set forth in the trust deed. The transaction was not a simple, direct, present transfer from himself to the daughter; it was a rather complex scheme providing for and effectuating,inter alia, the disposition of the ownership and enjoyment of that property after his death. There could scarcely be a clearer case of transfer made in substitution for a testamentary disposition. Cf. Kunhardt v. Bugbee, 4 N.J. Mis. R. 692, at694, 134 Atl. Rep. 118. Also Scheider v. Martin, supra.
Appellant strongly contends that in order that a gift be taxable as being made in contemplation of death, it is essential that that contemplation shall have been the dominant, — (orthe controlling or the determinative, c.), — motive or purpose or cause for the transfer; and cites the use of such phrases by the United States Supreme Court in such cases asUnited States v. Wells, supra, and Colorado National Bank
v. Commissioner, 305 U.S. 23. That court does say, in theWells Case, — "The words `in contemplation of death' mean that the thought of death is the impelling cause of the transfer;" and in the Colorado Bank Case, — "The mere purpose to make provision for children after a donor's death is not enough conclusively to establish that action to that end was `in contemplation of death.'"
With all due respect for that court, it must be said that such is not the law in this state; and that those statements are not only not controlling upon the courts of this state, but are contrary to the considered conclusions of our courts.
It is of course well established in New Jersey that it is not essential to taxability of a transfer as made in contemplation of death, that the considered intention to make a present transfer in lieu of a testamentary disposition shall have been the sole motive for the transfer. In re Grabfelder, supra; Schweinler v.Martin, supra; Scheider v. Martin, supra; In re Hartford,supra. It is sufficient if the desire and intent to accomplish an ultimate disposition and distribution of his *Page 358 
estate in lieu of a testamentary disposition in that behalf, isan impelling motive for the transfer. In re Hartford, supra, at p. 491; and such also is the force and effect of Scheider
v. Martin, supra.
The statute does not use the word "dominant" or "controlling" or any other such word. The statute makes taxable an intervivos transfer if "made in contemplation of death." The legislative purpose and intent was to impose the inheritance or succession tax on all transfers testamentary in character.Schweinler v. Martin, supra, at p. 74; Hartford v. Martin,supra, at p. 286. A transfer is made in contemplation of death if it is made, and intended, in the place and stead of testamentary disposition. Scheider v. Martin, supra.
To hold that in order that an inter vivos transfer testamentary in character be taxable it must appear that the transferor's dominant purpose and motive was simply to accomplish a present disposition of his property in lieu and stead of testamentary disposition, would be to nullify in many, if not most, cases the plain object of the statute. Rare indeed would be the instances where that, as such, was the dominant purpose. In most, if not all, cases the dominant purpose of the transferor is to confer a benefit on the transferee, just as it is in those cases of transfer which have no taint of the flavor of testamentary disposition. He makes the transfer which is a substitute for testamentary disposition in order to effectuate that dominant purpose of benefaction to the transferee. But obviously the statute is not concerned with such a dominant purpose. It is concerned only with the fact that he has an intent to make (and does make) a transfer in lieu of a testamentary transfer, irrespective of whatever dominant purpose he may have in furtherance of which he makes the intentional transfer in lieu of testamentary disposition. This is obvious in view of the definitely clear and established fact that "the dominant purpose of the legislature was to reach substitutes for testamentary dispositions."
The legislature said nothing about the transferor's dominant purpose. It said that a transfer "made in contemplation of death" shall be taxable; and it is well established that in and by that language it meant to make taxable all transfers *Page 359 
which were testamentary in character, — other than those transfers intended to take effect at or after death which are specified as such in the other clause of the statute. Necessarily, then, the transferor's "dominant purpose" in making such a transfer is quite immaterial. The only material question is, — did he make such a transfer, — did he consciously and intentionally make a transfer in lieu of a testamentary disposition, — irrespective of any and all reasons, purposes, motives or desires which may have led him to do so. If he did, then he made the transfer in that contemplation of death which results in testamentary disposition; he made it in contemplation of death within the meaning and intent of the statute in that behalf.
Hence, even if it should be said that Mr. Johnson's dominant purpose or reason for making this transfer, consciously made as instead of a testamentary transfer, was to benefit himself, — to make himself happier for the rest of his indefinitely long life, (by removing the friction between himself and his daughters and restoring the previous harmonious and enjoyable relationship), — and was therefore "associated with life rather than with death" (as is said in some of the decisions in other jurisdictions), that in nowise prevents the transfer from being taxable.
Beyond any question his mental process or "contemplation" was (briefly and substantially) this: — "I am going to remarry but I still want my daughters to have the bulk of my estate at my death; I have already so provided in my will; I will make some changes in my will for the benefit of my wife, but I can still provide therein that my daughters get the bulk of my estate. On the other hand, I can also accomplish this by giving it to them now, in a certain manner and under certain conditions, and also accomplish all the other things I wish, some of which I cannot accomplish in any other way. Because of (such and such) reasons, I prefer the latter course, and will adopt it." Beyond any question he made a conscious, intentional choice between testamentary disposition and present transfer, in favor of the latter. As the result of that contemplation of death which leads to testamentary disposition he intentionally made a present *Page 360 
transfer in the place and stead of testamentary disposition. The transfer is therefore taxable; why he made that choice is immaterial.
The commissioner did not err in his determination that the transfers were made in contemplation of death and were therefore taxable.
2. Date of valuation of the property transferred.
Appellant assigns as error that the commissioner appraised the value of the transferred property as of the date of the transfers; contending that such appraisal should be made as of the date of the death of the transferor.
He alleges in his brief that the latter practice has been invariably followed by the commissioner for the last thirty years or more. This is denied by respondent's brief. Assuming, for the sake of argument only, that appellant's allegation is correct, it can be of no avail to him as against the judicial determination of the law upon this point, already heretofore made and which is contrary to appellant's provision.
Under the statute, the tax in respect of an inter vivos
transfer made in contemplation of death, but not being intended to take effect at or after the transferor's death, is to be computed on the value of the property as of the date of transfer.Renwick v. Martin, 126 N.J. Eq. 564, 10 Atl. Rep. 2d293.
The commissioner did not err in this behalf.
3. Rate of interest on unpaid portion of tax.
In and by the assessment of tax made in respect of this estate, the tax was assessed at $337,988.59. On August 16th, 1933, prior to the actual assessment, the estate had paid to the State Treasurer on account of such tax indebtedness as should eventually be determined to be due, the sum of $53,873.89; and on September 28th, 1936, a further payment of $7,456.55 was made on account. Copy of the assessment *Page 361 
was duly sent to the executors by the commissioner, and accompanying the same was a notice, or bill, or statement setting forth the amount of the assessment, crediting the partial payments and charging interest at the rate of ten per cent. on unpaid balances.
In and by the petition of appeal the appellant purports to specify as error and as one of the grounds of appeal, "the inclusion in the said assessment of interest at the rate of ten per cent. per annum," — alleging that the rate should be only six per cent. The correctness of this contention was argued, on the merits, in the respective briefs.
It is deemed however that no such issue is, or can be, properly before this court for consideration and determination on this appeal.
The matter of interest penalty is entirely separate and distinct from the tax, — both under the statute and in the actual assessment of the tax. The statute has provisions for the levy and assessment of the tax, and separately provides that the tax assessed shall be due and payable at certain times and if not paid on such due date shall bear interest at certain rates. The tax is fixed and determined by the assessment; the interest is separate from and additional to the tax; it is a statutory charge imposed as penalty for nonpayment of the tax assessed. Desirable as it might well be that the interest charge be a part of the tax assessment, the legislature has not so provided.
The tax assessment in the instant case contains no item of any such interest; and properly so. The appeal is from the assessment, and properly so. The right to such appeal is statutory and is given in and by section 18 of the statute. The right thereby given is that of appeal from the assessment; no right is given to appeal from any claim or determination of the commissioner in regard to what liability rests upon the estate in respect of interest penalty.
The assessment of tax (if not appealed, or as finally determined after review), is a finality, and is a lien on the property of the decedent's estate. It is not, however, a judgment enforceable by execution against the executors or transferees individually; and neither can the collection of any interest *Page 362 
penalty thereon be enforced, without more. By section 21 of the statute provision is made for proceedings to obtain such judgment; and in and by such judgment, the amount of liability for interest would be fixed and determined. Under the provisions of the statute it would seem that then, and in that manner, is that question to be determined.
In any event, the amount of liability for interest is no part of the tax assessment; is not, and does not purport to be, any part of the tax assessed in the instant case; is not made by the statute the subject of appeal in such appeal as the present; and therefore is not within the jurisdiction of this court on this appeal.
In In re Lake's Estate, 82 N.J. Eq. 327, 88 Atl. Rep. 188, it is pointed out that the proper proceeding for judicial determination as to interest in the tax is that under section 21 of the statute; and that was the course pursued in Bugbee v.Tatum, 131 Atl. Rep. 289, (not reported in N.J. Eq.). It appears that in one or more cases this court has purported to pass upon the question of interest, in the course of appeal from the assessment, — this question of jurisdiction not having been raised and not having been considered by the court; but this of course does not suffice to confer jurisdiction in the instant case. Cf. In re Roebling's Estate, 91 N.J. Eq. 72,108 Atl. Rep. 359.
Finding no error in respect of either of the alleged errors which are cognizable as grounds of appeal in this proceeding, the tax will be affirmed, with costs. *Page 363