On March 8th, 1938, Otto L. Dommerich, a resident of Rumson, Monmouth County, New Jersey, died. Born February 6th, 1871, he had lived three score years and seven. Surviving his demise were his wife, Caroline C. Dommerich, two married daughters, Julie Dommerich Okie and Carola Dommerich Elliott, and a son, Louis F. Dommerich. The decedent was relatively wealthy at his death. The volume *Page 221 
and synthesis of his estate as determined by the State Tax Commissioner can be summarily exhibited as follows:
 1. Real Property ........................ $50,000.00
 2. Personal Property .................... 4,061,359.56
 3. Transfers ............................ 909,387.75
 _____________
 4. Gross Taxable Estate ................. $5,020,747.31
 5. Debts, Expenses, etc. ................ 363,075.36
 _____________
 6. Net Taxable Estate ................... $4,657,671.95

A transfer inheritance tax was levied upon the transmissible portions of this estate. The third item entitled "Transfers" is composed of securities which were gratuitously assigned in trust by the decedent to certain beneficiaries on December 10th, 1935. The taxation of these transfers as inter vivos gifts made by the decedent in contemplation of death is the root of the present appeal.
Our statutes, chapter 90, Laws of 1935, in effect when the trusts were created and N.J.S.A. 54:34-1, c in force when the settlor died, ordain that a transfer inheritance tax shall be assessed on all inter vivos transfers which are made in contemplation of the donor's death. The judicial interpretations of the statute are immediately accessible. The course of legitimate action in the taxation of such transfers seems to me to be distinct. The essential and indispensable factual basis for such an assessment must first be found to exist.
Therefore, the question which assumes precedence in this proceeding is: Were the inter vivos transfers to which the present inquiry relates, made by the decedent in contemplation of death, within the established import and purpose of the legislature? Lichtenberg declared "There is nothing more impenetrable than the motivation of our actions." Lord Kenyon was convinced that judicial tribunals should determine a man's motives from his overt acts.
The transcript of the exhibits and other proofs provides the factual material to be explored in quest of some evidential manifestation of the motive which impelled the decedent to *Page 222 
accomplish the transfers at that time. The determinant of the taxability of such transfers is the motive of the transferor.Moore v. Martin, 125 N.J. Law 189; 14 Atl. Rep. 2d 482;Squier v. Martin, 131 N.J. Eq. 263; 24 Atl. Rep. 2d 865;Kavanaugh v. Kelly, 131 N.J. Eq. 398; 25 Atl. Rep. 2d547; Plum v. Martin, 132 N.J. Eq. 1; 26 Atl. Rep. 2d529, or, if you prefer, the determinant may be characterized as "the motivating cause" or "the controlling purpose." Vide,Schweinler v. Martin, 117 N.J. Eq. 67, 93; 175 Atl. Rep. 71;Cairns v. Martin, 130 N.J. Eq. 313; 22 Atl. Rep. 2d 415.
The justification for the assessment depends most frequently upon the inferences to be logically and reasonably drawn from the relevant facts adequately established by the plausible and credible evidence of the individual case. MacGregor v. Martin,126 N.J. Law 492; 20 Atl. Rep. 2d 427. In Kavanagh v.Kelly, supra, I divulged that in these cases much illumination is derived from evidence exhibiting the personal qualities of the transferor, his habits and propensities, his age and state of health at the time, the pertinent circumstances amid which he was situated, his conduct both prior and subsequent to the transfers, the intrinsicalities of his inter vivos gifts, the fashion of his former and ultimate testamentary dispositions of his estate, to which may be added the co-ordinate relation of inter vivos
gifts of a testamentary character to those bestowed by his will.
This decedent was evidently an intelligent and perspicacious person. He was opulent as early as 1922 and he managed his fortune prudently. Assuredly, he was not communicative concerning his personal affairs, his transferences and his state of health. His demeanor supports the proverb "The words of a silent man are never brought to court." He disclosed no articulate reason for the creation of the three inter vivos trusts except to his son to whom he merely remarked that he made the transfers to "avoid" income taxes. He never informed his daughters of the trusts established for their benefit. Their nebulous information concerning the gifts was imparted to them by their mother who frankly *Page 223 
confesses that she knew little about them. None of his children was acquainted with the terms of the trust indentures or aware of the particular securities comprising the corpus or of the amount of income actually derived from them. Such knowledge was acquired by them after the death of their father. Whatever the motive, the decedent had no recognizable accomplice.
The decedent was likewise taciturn regarding his maladies and indispositions. It was his nature to depreciate them. This quality reminds one of Clarence Day's delightful memoir of his father who despised disease, regarded illness as imaginary but ultimately became convinced that he was in fact ill. Similarly, the consciousness of failing health broke in upon the meditations of this decedent.
The transcript of the evidence is profuse with enlightenment relative to the declining health of the decedent. A superfluous recital of all this evidence will not be undertaken. The evidence has been thoughtfully examined. The inferences are that in November, 1935, the decedent became aware of some debility. In January, 1936, he learned that during a few months then last past he had lost eleven pounds in weight. In February, 1936, the infections presaging his fatal illness were objectively manifest. In June, 1936, he was admitted to the hospital where he underwent surgical operations and from which institution he was not discharged until the ensuing October. In August, 1936, the amputation of his leg was under advisement. He is reported to have died from "chronic nephritis and contributory tuberculosis of the lymph glands and bones." The hospital discharge sheet records that he "also has chronic pulmonary tuberculosis." From these facts, it is entirely probable that the decedent noticed some inauspicious signs of approaching ill health before, in point of time, he definitely resolved to effectuate the transfers. Cf. Kunhardt v. Bugbee, 3 N.J. Mis. R. 1107;130 Atl. Rep. 660; affirmed, 4 N.J. Mis. R. 692; 134 Atl. Rep. 118.
It is not incumbent upon the taxing authority to prove that the transfers were made because of a conviction that death was imminent. Schweinler v. Martin, supra; *Page 224 Nicholas v. Martin, 128 N.J. Eq. 344 (at p. 346);15 Atl. Rep. 2d 235; Cairns v. Martin, supra.
Certain transactions which the decedent completed shortly before the collapse of his health are also revelatory. They, too, may be expository of his state of mind. In the late summer and early fall of 1935, he acquired additional life insurance in the sum of $150,000. During the months of August and September of that year, he assigned to his wife policies on his life of the face value of $500,000, also relinquishing not only his right to change the beneficiary but also his right to obtain the cash surrender value of the policies. Incidentally, his wife already possessed considerable resources. It was in December, 1935, that he established the trusts to which this appeal relates. Obviously, he is lending an ear to the admonition "Set thine house in order."
It was during this season of 1935 that the decedent requested his accountant to present to him a list of his securities. The decedent selected certain of them of the existing value of $909,387.75 and thereupon instructed his accountant to divide them equitably into three portions. On December 10th, 1935, the decedent transferred by formal declarations these securities in trust for the benefit of each of his children in the values here stated: to Louis, $254,426.25; to Julie, $324,250; to Carola, $330,711.50.
The character of the gift always deserves attention. There is discernible in these gifts a purpose to provide for the future. The trust originated for Louis directs the payment of the income of the corpus to him for life and at his death the corpus is distributable as Louis may prescribe by his will, or failing such disposition, to the lawful issue of Louis or if Louis dies intestate and without issue, to the then surviving children of the settlor or their issue, per stirpes. The terms of the other two trusts make the income in each case payable to the daughter for her life and at her death the corpus passes to her issue,per stirpes, or in default of issue, to the then surviving children of the settlor or their issue, per stirpes. The decedent thus fabricated estates which in all likelihood would come into possession of some beneficiaries *Page 225 
many years beyond his death. Manifestly, the transfers are of a testamentary type.
The decedent apparently desired to retain the privilege of supervising the administration of the trusts. He and his wife were designated as the trustees and they were empowered to sell any of the trust property publicly or privately upon such terms as they considered proper. Moreover, they were to exercise the voting rights of the shares of stock so held in trust with authority equivalent to that of absolute ownership. The decedent assumed and discharged the duties of the trustees.
Additionally, I note that upon the erection of the trusts, the decedent thereafter continued to make disbursements to his children from the income in much the same manner as he had made donations to them previously from his own funds. During the remainder of decedent's life, the children did not receive the entire income to which each was entitled. Substantial sums (in the aggregate $37,000) were lodged in their trust accounts under the surveillance of the decedent. Evidently, the son and daughters were not then in need of the income actually bestowed. This impression is strengthened by the fact that Louis received $78,000 from his father in December, 1930. There was at the creation of the trusts, no financial stress upon his children which the decedent sought to alleviate. The transfer of antemortem interests was not urgent.
It may be supposed that there are frequently a variety of desires or motives of gradational persuasibility which co-operate to induce a donor to make inter vivos transfers. It is not a requisite of taxability that contemplation of death should have been the sole motive for the transfers. Schweinler v. Martin,supra; In re Grabfelder, 107 N.J. Law 520; 153 Atl. Rep. 532; Inre Hartford, 122 N.J. Eq. 489; 194 Atl. Rep. 800; affirmed,122 N.J. Law 283; 4 Atl. Rep. 2d 31; Nicholas v. Martin,128 N.J. Eq. 344, 357; 15 Atl. Rep. 2d 235; affirmed on this point, 127 N.J. Law 35; 21 Atl. Rep. 2d 323; Cairns v.Martin, supra (at p. 322). The object of the statute is to tax testamentary *Page 226 
and intestate transfers and also inter vivos transfers which are in fact makeshifts employed to effectuate a purpose normally accomplished by will. The statute envelops all transfers which in reality are substitutes for testamentary dispositions. Squier
v. Martin, supra, and cases therein cited.
In the present proceeding, there is a radiant circumstance which, when intensified by the other facts, clearly indicates the probable truth. Apprehensive of declining health, the postmortem interests and situations of the members of his family naturally captured the attention of the decedent. Cairns v.Martin, supra. The realization at once came to him that he had made no provision whatever in his will which would be beneficial to his children until after the death of their mother. He recognizes the prudence of promptly supplying the deficiencies in his will. He decides to organize trust estates to be administered by him during his life and to so fashion them as to assure his children of continual financial aid despite his death and yet govern the ultimate distribution of the principal in substantial conformity with his adopted testamentary plan. The trusts of 1935 are the singular completion of the will of 1931. This particularly emphasizes the testamentary purpose and character of the transfers. The decedent having two methods available elected to employ a substitute for a testamentary devolution, and it is now indisputable that where an inter vivos gift as a result of a considered choice is intentionally made in the place and stead of a testamentary disposition, it is taxable under the provisions of the statute. Central Hanover Bank, c., v. Martin, 129 N.J. Eq. 186,189; 18 Atl. Rep. 2d 45; Perry v. Martin,125 N.J. Law 46, 47; 14 Atl. Rep. 2d 266; Scheider v. Martin,124 N.J. Law 567; 12 Atl. Rep. 2d 678; affirming s.c.,127 N.J. Eq. 323; 13 Atl. Rep. 2d 223; Nicholas v.Martin, supra; MacGregor v. Martin, supra; In re Grabfelder,supra; Cairns v. Martin, supra. The substance of the transfer rather than the form controls. In re Hollander, 123 N.J. Eq. 52;195 Atl. Rep. 805; In re Schlegel, 111 N.J. Eq. 324;162 Atl. Rep. 651; In re *Page 227 Gemmel's Estate, 123 N.J. Eq. 315; 197 Atl. Rep. 428. A gift is taxable if it is made as a result of that contemplation of death which leads to testamentary disposition. Schweinler v. Martin,supra. The dominant purpose of the statute in this regard is to encircle substitutes for testamentary dispositions and thus to prevent the evasion of the tax. United States v. Wells,283 U.S. 102; Nichols v. Coolidge, 274 U.S. 531; Milliken v.United States, 283 U.S. 15; Heiner v. Donnan, 285 U.S. 312.
Presumably, love, affection or gratitude are in some degree causative of gifts regardless of the time or manner in which they are conferred. Aristotle believed that pleasure and nobility supplied the motives for such actions. It is also suggested here that the decedent sought to "avoid" income taxes. An arithmetical computation is submitted to disclose a net saving by the decedent of approximately $24,000 a year in income imposts. One hesitates to accept this motive when apprised of the fact that the decedent paid a gift tax of $151,998.52 to the federal government in consequence of these transfers. Actually, the net effect of the maneuver in its relation to taxation was an apparent loss of about $100,000. The decedent was too intelligent to overlook such a possible eventuality. The tax-conscious person thinks not only of income taxes but also of gift and inheritance taxes. He reckons the toll on every available route.
Assuredly, the reduction of his income taxes was neither the sole nor the principal purpose for making the transfers. The chief purpose of the transfers was to benefit and provide for the transferees. Suppose the decedent fancied a paradox like "taxavoidance" or the less fantastic contemplation of "taxsaving," would not inheritance taxes as well as income taxes and gift taxes flash across his mind? He always understood that he could reduce income taxes by disposing of his income-producing resources. Yet he did not consider it expedient to do so until December 10th, 1935. He was aware that a federal gift tax would settle upon his gratuitous transferences. He also knew that death would sometime overtake him and taxes would be levied upon his *Page 228 
estate. He realized that he had made no beneficial provision by will or otherwise for his children effective after his death until the death of his wife. Continuing, however, to presume that tax avoidance was the predominant objective of his cogitations, is it not more than a permissible inference that he anticipated future increases in tax rates? When the rates specified by the Estate Tax Law are increased there is a corresponding increase in the federal gift tax rates. Cf. 48 U.S. Stat. at Large, ch. 277§ 405 (at p. 754) with § 520 (at p. 761) Ibid., and49 U.S. Stat. at Large, ch. 829 § 201 (at p. 1021) with § 301
(at p. 1023) Ibid. And so, if this artificial conception of the state of mind of the decedent is assumed, the deduction is inevitable that his intention and purpose embraced both a saving of income taxes and an evasion of transfer inheritance taxes. A desire to evade death duties is evidential of the pre-testamentary nature of an inter vivos gift. Nicholas v.Martin, supra; MacGregor v. Martin, supra; City Bank FarmersTrust Co. v. Martin, 126 N.J. Law 506; 20 Atl. Rep. 2d56; Hartford v. Martin, supra; Cairns v. Martin, supra.
The transfers evidenced by the deeds of December 10th, 1935, were made by the decedent in consequence of such a contemplation of death as ordinarily induces a reasonably prudent person to formulate a testamentary disposition to effectuate such a purpose. The preponderance of the evidence sustains this conclusion. The assessments are affirmed.
The Commissioner assessed the tax in this estate prior to the recent decision in Rutgers v. Martin, 127 N.J. Law 603;23 Atl. Rep. 2d 406; affirming, sub nom. Nicholas v.Martin, 127 N.J. Law 35; 21 Atl. Rep. 2d 323, in which the Court of Errors and Appeals sanctioned the rule first enunciated by the Supreme Court in Wimpfheimer v. Martin,126 N.J. Law 502; 20 Atl. Rep. 2d 433, that inter vivos
transfers made in contemplation of death are to be valued as of the date of death of the donor and not as of the date of transfer. Overruling, Renwick v. Martin, 126 N.J. Eq. 564,582, 587; 10 Atl. Rep. 2d 293, and Wimpfheimer v.Martin, 127 N.J. Eq. 587, 594; 14 Atl. Rep. 2d *Page 229 59. It is, however, now mutually acknowledged that the securities transferred in trust were worth $826,878 on the date of the testator's death and the corpus of each trust will be appraised as of the date of the donor's death in conformity with the stipulated values. Having appraised the securities so transferred at their clear market value as of the date of the death of the transferor, the Commissioner is then obliged to fix the value of the life estate in each trust. N.J.S.A. 54:36-1.
In determining the value of a life estate, the American Experience Table of Mortality, with interest at the rate of fiveper centum per annum shall be used. N.J.S.A. 54:36-2. The value of the remainder is ascertained by deducting the value of the life estate from the appraised market value of the property so limited. The point is now made debatable whether in utilizing, as directed, the mortality table factor in evaluating the life estate, it should be applied as of the date of the transfer or as of the date of the transferor's death. In Wimpfheimer v.Martin, supra, and again in Nicholas v. Martin, supra, it was stated "The tax is a transfer tax at death. When there is a life estate the tax upon the remainder awaits the time of beneficial enjoyment. With this exception, all taxes are due upon the death of the testator." I am therefore constrained to hold that the mortality table factor in evaluating the life estates should be applied as of the date of the decedent's death.
 A decree will be advised in accordance with these conclusions. *Page 230