The late Frank M. Avery, formerly a member of the law firm of Phillips Avery of New York City, is reputed to have been a scholarly and perspicacious person. He died on March 3d 1944, at the age of eighty-six, a resident of Sparta, Sussex County, New Jersey. Death caused by an embolism following a prostatectomy visited him suddenly. Surviving him were his daughter, Marion F. Avery, and two sons, Irving M. Avery and Henry C. Avery.
In February, 1932, the decedent at the age of seventy-four transferred all of his real estate including his menage and all of his personalty, valued collectively for inheritance taxation at $120,437.56, to his daughter, Marion, and his son, Irving. Associated with the transfers was a written agreement bearing date February 26th, 1932. Cf. Nicholas v. Martin, 128 N.J. Eq. 344,356, 357; 15 Atl. Rep. 2d 235; modified,127 N.J. Law 35; 21 Atl. Rep. 2d 323; affirmed, 127 N.J. Law 603;23 Atl. Rep. 2d 406; In re Kellogg, 123 N.J. Eq. 322;197 Atl. Rep. 263; In re Hartford, 122 N.J. Eq. 489, 493;194 Atl. Rep. 800; affirmed, 120 N.J. Law 564; 1 Atl. Rep. 2d 13; furtheraffirmed, 122 N.J. Law 283; 4 Atl. Rep. 2d 31.
I have said that the decedent was a man of acute discernment. A perception of transfer inheritance taxation seems also to have been one of his attainments. He not only scented, perhaps from afar, the eventual incursion of such taxes, but he sought vigilantly to erect a stockade. Give attention initially to the preamble which more than ornaments his agreement:
"WHEREAS the party of the first part is in good health considering that he is 74 years of age, has no contemplation of death, is not under *Page 82 
the care of any physician, and has a normal expectancy of life, according to the mortality tables, of 6.7 years; and
"WHEREAS the party of the first part, having now arrived at an advanced age in life, has for some time past desired to retire definitely from active business and to relieve himself of the management of his affairs and to leave same in the hands of two of his children, namely the parties of the second part; and
"WHEREAS pursuant to his foregoing desires the party of the first part has heretofore deeded, conveyed, assigned and/or transferred to the parties of the second part, individually or as tenants in common, all of his property of every nature and description, real, personal and mixed and wheresoever the same may have been situated, upon the agreement of the parties of the second part in general to support him for the remainder of his natural life in the manner he has been accustomed to live; and
"WHEREAS the party of the first part desires to live with one and/or both of the parties of the second part in his, her or their home, where he can be comfortable the remainder of his life, and whereas he is now in fact so living in the apartment of one of the parties of the second part, and whereas the parties mutually desire that their general agreement shall be reduced to writing;
"NOW, THEREFORE, * * * in consideration of the fact that the party of the first part has heretofore deeded, conveyed, assigned and/or transferred to the parties of the second part, individually or as tenants in common, all of his property of every nature and description * * * the parties of the second part jointly and severally covenant, promise and agree to and with the party of the first part as follows:
"1. They will provide him with a comfortable home and support, treat him kindly and respectfully and maintain him, giving him food, clothes, nursing and medical attention, medicine and all other reasonable necessities suitable to his condition, age and standing in life; the said home shall be in the apartment or home of either and/or both of the parties of the second part; they will provide him with spending money not to exceed the sum of $100 per month, to be used by him as he sees fit for his own personal use and expenses or for traveling or for anything that he reasonably needs for his own personal benefit; as and when they are able, they will furnish him with the use of an automobile; they will pay his dues for clubs and such other organizations of which he has usually been or may properly be a member; and, upon his death, they will provide him with areasonable and commendable burial and erect an appropriatetombstone. (Emphasis supplied.)
"2. The parties of the second part will respectively make provisions in their last wills and Testaments necessary to carry out their obligations under the preceding paragraph of this instrument, and keep the same effective at all times during the life of the party of the first part.
"3. The parties of the second part jointly and severally bind themselves, their heirs, executors, administrators and assigns, by this agreement, but in the event of the death of either of them before the death of the party of the first part, it is understood as between the parties *Page 83 
of the second part that the mutual obligations hereunder of the survivor and the decedent's estate shall be as nearly as possible equal.
"4. The party of the first part hereby confirms the transfer of all his property as by preamble hereto above stated for the purposes herein set forth."
The taxing authorities have resolved that the inter vivos
transfers by the decedent to his two children are assessable because they were made by the decedent "in contemplation of death" or "intended to take effect in possession or enjoyment at or after the death of the donor. R.S. 54:34-1, c; N.J.S.A.54:34-1, c. The representative of the decedent's estate protests, hence this appeal.
Many of the rules applicable to the taxing statute and its operation are now too inveterate to be further agitated. The object of the statute is to tax not only testamentary and intestate transfers but also inter vivos transfers which as mere substitutes for testamentary dispositions are employed to effectuate a purpose normally accomplished by will. Squier v.Martin, 131 N.J. Eq. 263; 24 Atl. Rep. 2d 865; Dommerich
v. Kelly, 132 N.J. Eq. 220; 27 Atl. Rep. 2d 871; affirmed,130 N.J. Law 542; 33 Atl. Rep. 2d 893; affirmed,132 N.J. Law 141; 39 Atl. Rep. 2d 30: Voorhees v. Kelly, 132 N.J. Eq. 230; 28 Atl. Rep. 2d 61; affirmed, 130 N.J. Law 61;31 Atl. Rep. 2d 404; affirmed, 131 N.J. Law 226; 35 Atl. Rep.
2d 895.
There is no statutory or evidential presumption, express or to be implied solely from the statute, that a transfer made by a decedent more than two years before his death was not made by him in contemplation of death. Voorhees v. Kelly, supra;Coffin v. Kelly, 133 N.J. Eq. 188; 31 Atl. Rep. 2d 186;affirmed, 131 N.J. Law 241; 36 Atl. Rep. 2d 11; furtheraffirmed, 133 N.J. Law 252; 44 Atl. Rep. 2d 29. If the transfer is made beyond the two-year period, the burden devolves upon the taxing authorities to adequately establish that contemplation of death was an impelling motive for the transfer. Folsom v. Martin, 126 N.J. Law 472, 479;20 Atl. Rep. 2d 8; Voorhees v. Kelly, supra.
In the present appeal, it is emphasized that the transferor expressly announced that he had "no contemplation of death." *Page 84 
Of death and taxes, I do not fancy that the transferor ever supposed he could elude the former. If he made the transfer in contemplation of the knowledge that his death would be eventually inevitable and with the intent and purpose of accomplishing a distribution or transfer in lieu and stead of a testamentary disposition, which purpose he accomplished, the transfer is taxable under the statute, even though he did not apprehend that his death was imminent or closely approaching. Bank of New York
v. Kelly, 135 N.J. Eq. 418; 38 Atl. Rep. 2d 899.
Where an inter vivos gift is, as a result of considered choice, intentionally made in the place and stead of a testamentary disposition, it is taxable. The substance of the transfer rather than the form controls. Perry v. Martin,125 N.J. Law 46; 14 Atl. Rep. 2d 266: Nicholas v. Martin,supra; Dommerich v. Kelly, supra. And so, realizing that taxation is a practical matter, it will be efficient "to put in contrast on the one side the substance and practical effect of what was actually done, and on the other the import and design of the terms of the taxing statute." Bank of New York v. Kelly,supra. As stated by the late Chief-Justice Stone in Helvering
v. Horst, 311 U.S. 112, 118: "Common understanding and experience are the touchstones for the interpretation of the revenue laws."
Real motives are often at work under the surface of events. Aspects are frequently apocryphal. The facts and circumstances accompanying, surrounding, and following the decedent's course of action must be inquisitively examined. Realities, if educed, sometimes destroy the fable of appearances.
The graphic language of Chief-Justice Case in Voorhees v.Kelly, 130 N.J. Law 61, 64; 31 Atl. Rep. 2d 404, may well be applied to this decedent: "He was definitely in life's late afternoon. His accomplishments were behind him." It is evident that the idea of transmitting his estate to the natural objects of his bounty was hospitably entertained. He preferred to consummate that purpose during his life. He proceeded to transfer every twig of his property in equal shares to his daughter, Marion, and his son, Irving. Incidentally I notice that in his last will executed on October *Page 85 
19th, 1933, he stated: "In making this will I am not unmindful of my son Henry Craddock Avery, S.J., but make no provision for him for the reason that his Holy Orders make this unnecessary." Moreover, his daughter Marion and son Irving are the only beneficiaries of the will.
The decedent associated with the transfers the agreement to which reference at length has been made. Significantly, it occurred to him to declare: "Whereas the party of the first part is in good health considering that he is 74 years of age, has no contemplation of death, is not under the care of any physician, and has a normal expectancy of life, according to the mortality tables, of 6.7 years." What a striking resemblance it bears to its twin brother, "being of sound and disposing mind and memory," commonly inhabiting the prelude to a will! A reason is ascribable to the use of each. Assuredly, this decedent in steering his course envisioned, like a well-informed navigator, the shoals of transfer inheritance taxation. It is not so much the agreement but its hereditaments that now expose the decedent's noticeable solicitude.
Assuming that one may resort to any lawful method available to avoid or diminish tax liability, yet a premeditated intention to evade transfer inheritance taxation by means of aninter vivos transfer has sometimes been recognized as at least a relevant factor in determining the contemplated purpose of the transferor in its relation to the terms of the statute. Vide,Schweinler v. Martin, 117 N.J. Eq. 67; 175 Atl. Rep. 71, writ dismissed, 13 N.J. Mis. R. 722; 180 Atl. Rep. 722; Nicholas v.Martin, supra; Cairns v. Martin, 130 N.J. Eq. 313;22 Atl. Rep. 2d 415; Barillet v. Kelly, 131 N.J. Law 140;35 Atl. Rep. 2d 457; Dommerich v. Kelly, supra; MacGregor v.Martin, 126 N.J. Law 492, 497; 20 Atl. Rep. 2d 427.
There is another clause of the prefatory part of the agreement that engages attention. It is that in which the decedent expressed his desire "to relieve himself of the management ofhis affairs and to leave same (i.e., management?) in the hands of two of his children * * *." (Emphasis and parenthetical insertion mine.) Were the contractual obligations imposed upon the donees conceived by the decedent to *Page 86 
be an adroit method, apparently dissimilar to a conventional pattern, by which he could retain the beneficial enjoyment of his estate until his death? It is observed that the donees were to provide the decedent with an annuity of $1,200, a comfortable home, food, clothing, nursing, medical attention, club dues, all other reasonable necessities suitable to his condition, age, and standing in life, and as and when they were able, furnish him with the use of an automobile. Foresight and proficiency also induced him to require the donees to execute wills containing provisions "necessary to carry out their obligations under" the terms of the agreement.
The investigations of the Tax Department have also surrounded the course of conduct pursued by the parties ensuing the transfer and its affiliated agreement.
I shall refer in a summary manner only to those incidents of special significance. On October 27th, 1932, eight months after the inauguration of his plan, the decedent caused his residential property at Sparta to be reconveyed to him. There he subsequently resided with his daughter Marion. The assets he had transferred to his son and daughter consisted for the most part of stocks, bonds, and like securities. These were initially placed in a safe deposit box at the New York Trust Company in New York City, to which his son and daughter were accorded access. The other terms of the agreement seem to have been fulfilled for a period of time.
On some occasion between 1932 and 1940, the son Irving surreptitiously extracted from the safe deposit box and appropriated to his own use, some of the securities of a value of $12,400. His act not only ruffled the decedent's plan but also his state of mind. The unauthorized withdrawal of the securities, upon its discovery, was manifestly regarded as a peculation. Why?
On April 25th, 1939, all of the remaining securities were placed in a custodial account with the New York Trust Company in the name of Marion, and the income was thereafter currently credited to the checking account of Marion. Irving was thereupon deprived of all custody and control of the securities and by virtue of an agreement between Irving and his sister dated May 1st, 1940, Marion in addition to the *Page 87 
sophistical monthly remittances of $100 to her father, also strangely deposited to his credit, or otherwise placed at his disposal, all of the remainder of the accruing income.
Irving died on April 18th, 1944, a resident of Brooklyn, New York. A stipulation reveals that his gross estate was reported and determined to amount to $50,987.60, which is approximately the value of his interest in the property transferred by the decedent. Circumstantially it may be inferred that the income from the corpus of the transfer was expected to be the source from which Irving and Marion would acquire the financial ability to discharge their obligations to their father under the agreement of 1932. Marion became engaged in the management of her father's household at Sparta. The evidence points rather to the conviction that the transfer was not absolute, immediate, and unqualified, but that it was itself encumbered by obligations of the donees, the performance of which was dependent upon the transfer and its fruits. It does not seem to me that the obligations of the donees were entirely independent of the transferred property. Cf. Fidelity Union Trust Co. v. Martin,118 N.J. Law 277; 192 Atl. Rep. 74; affirmed, 119 N.J. Law 425;197 Atl. Rep. 40; In re Honeyman, 98 N.J. Eq. 638;129 Atl. Rep. 393; affirmed, 4 N.J. Mis. R. 99; 131 Atl. Rep. 924; furtheraffirmed, 103 N.J. Law 173; 134 Atl. Rep. 915.
There are other factual circumstances meriting more than transient significance. One is the fact that the property was not actually divided between the donees for their immediate personal use, but all of the property transferred by the decedent, except as noted, continued to be safely preserved until his death. Another is the agreement of May 1st, 1940, between Marion and Irving, which subserved the purpose to defer the beneficial enjoyment of the transfers until the death of the decedent. I need only condense into quotations the second and eighth paragraphs:
"2. The parties hereto agree that the custody and management of said personal property and said real property shall remain in the control and under the management of said MARION F. AVERY, so long as she shall live, or until the sooner death of FRANK M. AVERY, and that upon her death, in case she died prior to the death of FRANK *Page 88 
M. AVERY, it is agreed that the said personal property shown on said Exhibit `A,' or the remainder thereof, or any substitutions therefor and the real property shown on said Exhibit `B,' or the remainder thereof, or any substitutions therefor, shall be turned over to the law firm of Phillips Avery, in case they agree to accept the same, to be under their custody, control and management until the death of said FRANK M. AVERY.
 * * * * * * *
"8. It is further understood and agreed that on the death of FRANK M. AVERY, said MARION F. AVERY, or her successors provided for herein, shall render an account of the said principal of said personal and real property, and after providing for the payment of any necessary expenses, fees, taxes or other charges, the sum of $12,400.00 shall first be paid to MARION F. AVERY, or her Estate, and that the balance of said principal sum shall then be divided in equal shares between MARION F. AVERY and IRVING M. AVERY, or their respective legal representatives."
The determinant of the taxability of an inter vivos transfer as in contemplation of death is the intent and purpose of the transferor. Schweinler v. Martin, supra. Whether or not a transfer comes into enjoyment or possession at transferor's death is a matter of a realistic examination of the shifting of economic burdens and benefits, the actual succession to property.Hartford v. Martin, supra; 121 A.L.R. 354; Squier v. Martin,supra, and cases therein cited.
However ingeniously fabricated the legal paraphernalia may be, the substantial retention by a transferor of the income and actual beneficial enjoyment of the fund for his life is an impressive circumstance. It is the intention to postpone until the death of the transferor the succession of the full beneficial enjoyment of the fund and its economic benefits that is noteworthy. Hartford v. Martin, supra; Bank of New York v.Kelly, supra.
Yet, if the possession and enjoyment of the gift is withheld from the donees until the donor's death, the transfer may be taxable in the absence of any retention of the income by the donor. In re Hollander, 123 N.J. Eq. 52; 195 Atl. Rep. 805.
Perplexity in the solution of these tax disputes is increased because they so often originate from what is intrinsically and tacitly a family arrangement. It seems to me somewhat fanciful to suppose that this decedent, a man of foresight and *Page 89 
circumspection, surmised at the age of seventy-four that his death was in the distant future and nevertheless resolved to relinquish absolutely and irrevocably his entire estate to his donees and to permit his future to tremble in the balance upon the contingent performance of the contractual obligations of his beneficiaries. "He is no wise man who will quit a certainty for an uncertainty," said Johnson.
I think that on the co-ordinated circumstances and actual practices of the parties, now made perceptible, hangs the tale.Optimus interpres rerum usus. The decedent made the transfers in the effort to avoid inheritance taxes. Such was the mirror of his hopes. He was "in life's late afternoon." He donated all of his possessions. He bestowed them upon the natural objects of his bounty. Nevertheless, he sedulously defended their preservation until his death. During the four years immediately preceding his death, he kept the income within his grasp. Upon his departure to the hospital in his last illness, he gave checks to Marion from the income amounting in the aggregate to $5,000 and said "That is my money, and I don't know how long I am going to be in this hospital, and I want you to take that and pay every bill." Curiously he died possessed of personalty in excess of $30,000. The descriptive expression of Surrogate Sexton (In re Dobson'sEstate, 132 N.Y. Supp. 472, 476) may be figuratively applied to the transfer of this decedent, "Dobson sold the cow, but hung onto the tail and milk."
In the present case I am unable to believe that, aside from his endeavor to frustrate the tax statute, the decedent intended to effect any substantial change in his economic situation until his death. Cairns v. Martin, supra. With a consciousness of his superior and dominant control which, indeed, he exercised, he entrusted the custody of his property to his children, but manifestly he retained the substance for himself. Vide,Helvering v. Clifford, 309 U.S. 331. The transfers are accordingly within the orbit and taxable category of the statute.Koch v. McCutcheon, 111 N.J. Law 154; 167 Atl. Rep. 752. The assessment is affirmed. *Page 90