On June 16th, 1939, one James W. Greene, a resident of South Orange, New Jersey, died at the age of seventy-five years, leaving a gross estate of $2,085,048.49. The State Tax *Page 399 
Commissioner increased the value of the estate alleged to be taxable under the provisions of chapter 228, laws of 1909, section 1, subsection "Third," as amended by chapter 244, laws of 1934, pages 698, 699 (see, also, R.S. 54:34-1, c) by adding the sum of $231,203.24, which was determined to be the total value of certain inter vivos transfers of the capital stock of J.W. Greene, Inc., made by the decedent in the years 1934 and 1935. The valuation attributable to these transfers is not criticised. This produced, after the allowance of deductions, a net taxable estate valued at $2,152,243.42.
The commissioner resolved that transfer inheritance taxes should be levied upon the inter vivos transfers in that they were in his judgment gifts made by the decedent in contemplation of death. The appellants assert that the assessment of the tax on these transfers was unjustifiable and erroneous. The factual propriety of these assessments is therefore the sole controversial issue to be determined.
The following memorandum will afford some acquaintance in general with the dates, the donees and the dimensions of theinter vivos gifts:
On August 27th, 1934:
To his brother Charles L. Greene, 200 shares.
To his sister Anna Bray, 100 shares.
To his sister Susan Cormier, 100 shares.
To his sister Mary J. Greene, 100 shares.
To his sister Katherine V. Fralick, 100 shares.
On June 4th, 1935:
To his brother Charles L. Greene, 100 shares.
To his brother George R. Greene, 100 shares.
To his brother William R. Greene, 100 shares.
On December 18th, 1935:
To his sister Anna Bray, 50 shares.
Obviously, these transfers were not made by the decedent within two years of his death and therefore the statutory presumption that he was actuated by a testamentary motive *Page 400 
does not arise. To affirm these assessments their justification must be found to be supported by the requisite proof that the transfers were in fact made as substitutes for testamentary disposition. Squier v. Martin, 131 N.J. Eq. 263; 24 Atl. Rep.
2d 865.
The motive of the donor is the determinative. Moore v.Martin, 125 N.J. Law 189; 14 Atl. Rep. 2d 482. Motive is that within the individual which incites him to action. A motive is in general a consideration which determines choice and becomes an incentive to the performance of some act. A motive probably does not operate to influence positive action unless there are facts in existence which create the motive. It would be idle to undertake to catalogue the circumstances which, in reasonable probability, would excite a design to pursue some particular course of action. The operation of human emotions cannot be reduced to definite rules. However, in cases like the present, in which a circumspect effort must be exerted to ascertain the probable intent and purpose of the transferor, evidence exhibiting the qualities of the transferor, his habits and propensities, his age and state of health at the time, the pertinent circumstances amid which he was situated, his conduct both prior and subsequent to the transfer, the intrinsicalities of his inter vivos gifts, their proximity to the date of his death and the fashion of his former and ultimate testamentary dispositions of his estate, provides some field of fact from which the impelling motive of his inter vivos transfers may be harvested.
The evidence in the instant proceeding has been thoughtfully reviewed and considered. It discloses that the decedent was a prosperous business man. He was for many years engaged in the sale of furniture and household furnishings which enterprise he pursued from 1919 until 1936 under the corporate franchise and name, J.W. Greene, Inc. He was twice married. His former wife died in June, 1919. His second marriage occurred in 1922. No children were born of either marriage. He had three brothers and four sisters in whose welfare he seems to have retained a constant and affectionate interest.
The decedent was apparently a person of generous inclinations. *Page 401 
Throughout a span of years he provided employment in his business for many of his own and his wife's relatives. He contributed liberally and continuously to the comfort of his four sisters. He leased a summer home for several seasons for their occupancy at Hampton Beach, New Hampshire. He financed ocean cruises for their enjoyment. He assured them that they need not undertake to save the proceeds of his gifts because he would provide for them in his will. If at any time they should desire to convert the stock given them into money, he instructed them to communicate with him. A niece whose mother died when the former was six years of age was educated and maintained by him until her marriage, after which he also gave her financial aid. In 1919 he voluntarily distributed approximately 1,000 shares of the stock of his company among his faithful employees. Other significant incidents of his munificence occurred in the year 1922. A bestowal of gifts seems to have been his policy. His last will dated December 15th, 1938, contains 138 bequests. These events and circumstances display in his life, generosity rather than cupidity. It is not intimated that these earlier gifts were made by the decedent in contemplation of death.
In 1929 the decedent purchased the business of his brother Charles to whom he delivered in payment small blocks of stock of the Consolidated Gas Company and National Biscuit Company and from which Charles was expected to receive a reasonably adequate income. In 1934 and 1935 the economic depression prevailed, resulting in a very material depreciation in the market value of these stocks, and in a substantial reduction in the brother's income. The decedent and his brother Charles were very companionable and in the circumstances it would naturally appear that the millionaire had triumphed over his less fortunate brother in the bargain of 1929. It was then that the decedent remarked, "Well, Charlie, I will make up the difference." This exigency, it is said, initially inspired the decision to make the transfers of 1934. Could he rehabilitate the financial resources of his brother Charles and ignore his four sisters who apparently depended very largely upon his liberality? He evidently resolved to transfer *Page 402 
200 shares of stock of his company to Charles and 100 shares to each of his four sisters.
In 1935, the income from the stocks originally delivered to Charles was even more diminished. The subject was discussed by the decedent and on June 4th, 1935, the decedent transferred 100 shares of stock of J.W. Greene, Inc., to his brother Charles and a like amount to George and to William.
His sister Anna Bray held certain shares of stock of Electric Power and Light Company which in 1935 had materially declined in value and on December 18th, 1935, the decedent, to allay the anxiety of his sister, exchanged with her fifty shares of the stock of his own company for the stock of the Electric Power and Light Company. These transfers consummated in 1934 and 1935 were deemed by the Tax Commissioner to have been made by the decedent in lieu of a testamentary disposition.
In 1936 the decedent sold his business and leased an office in Jersey City at which he continued to manage and supervise the investment of his funds and those of the company. He commuted by railroad almost daily to this office from his residence at South Orange or Deal until the day before he was stricken with his fatal illness in 1939. The certificate of death reports that the principal cause of death and the related causes in the order of onset were: heart block, June 7th; coronary occlusion, June 15th; hypostatic pneumonia, June 16th. No other contributory causes existed.
The decedent was seventy years of age when he accomplished the transfers in 1934. His brothers and sisters were not so much younger that he could confidently assume that they would survive him. The respondent concedes that the decedent was then in an extraordinarily good state of health and that at the time of the execution of these transfers, he had no special reason to apprehend death in the immediate future. Death did not, in fact, thereafter visit him until four years had elapsed.
In Moore v. Martin, supra, Mr. Justice Heher remarked "Age alone is not decisive." Vice-Ordinary Backes in In re Sacks,101 N.J. Eq. 709; 139 Atl. Rep. 53, stated "The fact that the deceased was past seventy when he made the gifts is *Page 403 
not, of itself, persuasive that they were made in contemplation of death."
It is observed that the sum total of all of the transfers involved in this appeal did not amount in value to scarcely more than ten per centum of the decedent's estate. They were complete and immediate gifts and were not of a testamentary character. The evidence fails to reveal any concurrent testamentary disposition. The will nearest in time to which reference is made in the evidence was executed in 1937. Additionally, it is distinct that this decedent was accustomed to bestowing relatively valuable gifts upon deserving relatives and employees. Our decisions show that this is a factor of significance. Moore v. Martin, supra;Wimpfheimer v. Martin, 126 N.J. Law 502; 20 Atl. Rep. 2d433; Cf. Cairns v. Martin, 130 N.J. Eq. 313, 334;22 Atl. Rep. 2d 415.
To sustain the imposition of the transfer tax on these intervivos gifts, it is necessary to infer that a man worth $2,000,000 who is in good health at seventy years of age, and of a naturally generous disposition, and who transferred to deserving relatives of approximately the same age, four and five years before his death, ten per cent. of his estate, did so to avoid an inheritance tax of about $11,000. Such an inference drawn solely from those facts rests upon nothing more secure than surmise and conjecture. Possibilities encompass both sides of the question, but to render the transfers taxable, there must be proof that they were motivated by those considerations which lead to testamentary disposition of property.
In the absence of evidence from which it may be logically and legitimately inferred that these inter vivos transfers were made by the decedent in contemplation of death, the assessments thereon must, of necessity, be vacated. A decree to that effect will be advised. *Page 404