The demise of Mary Gaddis Hay, a resident of Rumson, Monmouth County, New Jersey, occurred on January 6th, 1940. She had predetermined a testamentary disposition of her estate and had nominated her representatives who, in conformity with the existing law, apprised the Transfer Inheritance Tax Bureau of the assets to be administered, her inter *Page 2 vivos transfers and the testamentary successions. None of theinter vivos transfers was represented by the executors to have been made by the decedent in contemplation of death. The usual inquiry by a special investigator ensued. Evidence of the pertinent factual circumstances was adduced, succeeded by a laconic report of the investigator in an epistolary style that by reason of the age of the donor (she was then 64 years of age) and the aggregate amount of the gifts, the transfers were in lieu of testamentary disposition and therefore taxable.
Concurring in the conclusion, if not in the reasons, expressed by the investigator, the taxing department incorporated theinter vivos transfers in the taxable estate. The executors challenge the propriety of these assessments and in the prosecution of this appeal they project two problems for decision: (1) Were the inter vivos transfers made by decedent in contemplation of death (N.J.S.A. 54:34-1, c); (2) were certain shares of corporate capital stock justly appraised?
The determinant of the taxability of an inter vivos transfer as one made in contemplation of death is the intent and purpose of the transferor and the relevant factual circumstances of each case must be studied to justly determine whether the transfer was made as a substitute for testamentary disposition. The age of the donor and the substance of the transfer must not be allowed to entirely conceal the surrounding circumstances which may, perhaps, reveal the motivating cause of the transfer.
The uncontroverted evidence in the present proceeding from which a decision must be derived discloses that the decedent was once the wife of Matthias Plum, Sr. The marriage was procreant of three children. Mr. Plum possessed an estate of approximately $600,000 and his occupation yielded a substantial annual income. His wife, the decedent, enjoyed even greater resources which she had inherited from her parents. Somewhat prematurely in his life, Mr. Plum executed his last will in which he bequeathed his entire estate to his wife. This testament ante-dated the birth of his third child.
In 1926 and 1927 Mr. Plum and his wife conversed in the presence of their children about the advisable disposition of their respective estates. The continued security of the household *Page 3 
and the welfare of the children were subjects of superior solicitude. It was the concurrent desire that the estate of each parent should pass to the children. Mr. Plum, however, appreciated the expense entailed in the maintenance of the Rumson homestead and alluded to the uncertainty of future investment returns. He believed it to be expedient for him to leave his will unchanged, supplemented by an informal understanding with his wife that she would distribute his estate among the children whenever her own financial position in the existing conditions seemed secure. Mr. Plum died suddenly in January, 1928.
An event then occurred to which considerable significance must be ascribed in evaluating the credibility of the evidence in the present proceeding. It was previously observed that Mr. Plum executed his will prior to the birth of his youngest son, Matthias, Jr., and having failed therein to make provision for him or expressly disinherit him, this son became entitled to a two-ninth share of his father's estate. This interest was valued in excess of $125,000. In recognition of the expedient proposed by his father and in furtherance of the understanding between his parents, Matthias, Jr., transferred and assigned this distributive share of his father's estate to his mother.
Mr. Plum was a generous parent and he bestowed on each of his three children an annual monetary allowance of about $6,000. His wife perpetuated this practice. She retained the country estate for the continued comfort and enjoyment of the family.
In 1932, Mrs. Plum contemplated accepting the proposal of marriage of Mr. John Lewis Hay, a widower, who had been a friend of the family for many years. Mr. Hay possessed a substantial estate of his own. He was the father of four children by his former marriage. An ante-nuptial contract between Mrs. Plum and Mr. Hay reserved their estates to their respective families. It is said that upon her re-marriage, the decedent considered it then opportune to distribute the estate of her former husband among her three children. Matthias, Jr., testifies that it was he who persuaded her to defer it until she was confident that her new *Page 4 
marital venture would be fortunate. The marriage, consummated in 1932, was fortunate and the new relationship was harmonious. Mr. Hay thereupon assumed the financial responsibility of maintaining the household.
In August, 1935, Mrs. Hay made the inter vivos gifts which have now become the bones of contention. Mrs. Hay proposed the distribution of the entire estate of her former husband, some $600,000; she was urged to do so by her son Gaddis but dissuaded by Matthias, Jr., who seemed to command the confidence of his mother. The gifts comprise the absolute and unconditional transfer of securities valued at approximately $160,000 to each of the three children.
The unequivocal purport of the testimony is that these transfers were made pursuant to the family compact approved in 1927. After completing the transfers, Mrs. Hay ceased to make the annual contributions to the children.
It is prudent to ascertain the circumstances, if any, which made the transfers suit the occasion. In the present case, the family circle had then disunited. Gaddis resided in New York. He had just completed the liquidation of his business with a loss. He was unemployed and in need of capital with which to embark anew on some business enterprise. Significantly, the securities he received were invested in a new company of which he became vice-president. Mary's child was in boarding school and Mary was in Florida. Matthias, Jr., had married and occupied his own home in Rumson. He was constrained, however, to move to New York, a more convenient location from which to pursue his business affiliations. The testimony reveals that in such exigencies, the decedent believed the time opportune to advantageously distribute the father's estate among his sons and daughter. The inference arises from the evidence that Mrs. Hay, by virtue of the family agreement in accord with which Matthias, Jr., had assigned to her his share, voluntarily assumed to hold the estate of her former husband as if actually a trustee for their children.
The donor was 64 years of age at the time of the transfers. The taxing authority concedes that she was in good health. She died quite unexpectedly four and one-half years after the *Page 5 
transfers were performed. Her will, executed in 1937, two years following the transfers, bestowed her entire estate upon her own children with provisions for their issue in the event that any child should predecease her. This is the only will of the decedent to which the evidence relates.
An effort to conjure up a doubt of the existence of the family agreement is wholly unaided by any evidence and is dominantly repulsed by proof of the assignment by Matthias, Jr., to his mother of his inheritance, legitimately his, after the death of his father. That assignment is an insuperable testimonial of the family understanding. Unchallenged also are the stated circumstances existing in 1935 which presented the occasion for the transfers.
If assessments on inter vivos transfers are to be judicially reviewed, the evidence must be the field from which a decision concerning their propriety must be harvested. By what phantom broom can the evidence in this proceeding be swept out of the record? It cannot justly be rejected as improbable and incredible.
The burden of proving that these transfers were made in contemplation of death descended upon the taxing authority.Cairns v. Martin, 130 N.J. Eq. 313, 328; 22 Atl. Rep. 2d415; Squier v. Martin, 131 N.J. Eq. 263; 24 Atl. Rep. 2d865; Kavanagh v. Kelly, 131 N.J. Eq. 398; 25 Atl. Rep. 2d547. Since these transfers were made more than two years before the transferor's death, the statutory presumption is an unavailable aid to the state.
In observance of the duty of the Ordinary on appeals of this nature, a thoughtful consideration of the evidence has been achieved. Kellogg v. Martin, 130 N.J. Eq. 338; 22 Atl. Rep.
2d 430; Squier v. Martin, supra. It is concluded that the assessments of a transfer inheritance tax upon these intervivos transfers should be annulled.
The decisions in MacGregor v. Martin, 126 N.J. Law 492;20 Atl. Rep. 2d 427, and Squier v. Martin, supra, pervade this case. In the former case, the widow relinquished the large estate passing to her from her husband because she realized that it was her husband's intention that his estate should be divided equally among his wife and daughters. *Page 6 
The Tax Commissioner was unable to disprove the circumstances disclosed by the evidence and the appellate court resolved that the taxing authority had not supplied the burden of proof. In the present case, the evidence of the family concord is much more incisive. It is conspicuous that the estate distributed by the widow in the MacGregor Case was larger than that distributed by these transfers; that the widow's personal estate was much less and that the widow was not then assured of the salutary protection of a wealthy husband. The Squier Case is relevant for there, as here, the outright gifts were not in reality taken from the estate of the donor but from the estate of another which tumbled into the hands of the donor.
The second point of appeal propounds this question: In the absence of substantial sales of the stock of a close corporation, was the Commissioner justified in fixing its value by an analysis of the balance sheets and profits and loss statements of the company, or was he required to value the stock at the market price of the last known transfer? Previous decisions of this court have settled the question in favor of the taxing authority.In re Moore, 104 N.J. Eq. 400; 145 Atl. Rep. 727; Renwick v.Martin, 126 N.J. Eq. 564, 604; 10 Atl. Rep. 2d 293. Those decisions hold that in the absence of sufficient sales from which a market value may be confidently found, the Commissioner is justified in using asset value. In another tax field it has been determined that the true value of securities is not always ascertained by market prices. Universal Insurance Co. v. StateBoard of Tax Appeals, 118 N.J. Law 538; 193 Atl. Rep. 915;affirmed, 120 N.J. Law 185; 198 Atl. Rep. 836; affirmed,307 U.S. 313; 59 S.Ct. 918; 83 L.Ed. 1312. The record here reveals that the last consummated sale of the particular stock had occurred one and one-half years prior to testatrix' death. Lacking satisfactory proof of current market value, the Commissioner was justified in his resort to book or asset value.
 A decree will be advised in conformity with these conclusions. *Page 7