Were the inter vivos transfers accomplished by this decedent made by her in contemplation of death, i.e., as mere substitutes for testamentary dispositions, within the import and intendment of our statute? R.S. 54:34-1, c. In the present appeal, this is a factual question that involves the motive, intent and purpose of the transferor. Schweinler v. Martin,117 N.J. Eq. 67; 175 Atl. Rep. 71; affirmed, 13 N.J. Mis. R. 722;180 Atl. Rep. 774.
In general, a motive is a consideration which determines choice and becomes an incentive to undertake the accomplishment of some act. The inducement normally arises from the attractive and gratifying character of the consideration. Motives are frequently concealed or disguised. Often their detection is a perplexing task. The operation of human emotions cannot be reduced to definite and precise rules, but usually there are existing facts preceding, accompanying, surrounding and following the particular course of action from which the probable motive of the person can be logically and reasonably inferred.
Therefore, this appeal contemplates an investigation of the basic factual propriety of the assessment of a transfer inheritance tax by the Tax Commissioner on the inter vivos
transfers. Kellogg v. Martin, 130 N.J. Eq. 338; 22 Atl. Rep.
2d 430. The inquiry must be pursued with a consciousness that the object of the statute is to tax not only testamentary and intestate transfers but also inter vivos transfers which are in fact makeshifts employed to effectuate a purpose normally accomplished by will. Squier v. Martin, 131 N.J. Eq. 263;24 Atl. Rep. 2d 865; Kavanagh v. Kelly, 131 N.J. Eq. 398;25 Atl. Rep. 2d 547; Plum v. Martin, 132 N.J. Eq. 1;26 Atl. Rep. 2d 529; Dommerich v. Kelly, 132 N.J. Eq. 220;27 Atl. Rep. 2d 871; Voorhees v. Kelly, 132 N.J. Eq. 230;28 Atl. Rep. 2d 61.
The justification for the assessment depends upon the relevant and credible facts of the individual case. MacGregor v.Martin, 126 N.J. Law 492; 20 Atl. Rep. 2d 427. The transfers having been made more than two years before the transferor's death, there is no artificially created presumption *Page 190 
that they were or were not made in contemplation of death.Voorhees v. Kelly, supra. And so, the facts disclosed by the exhibits and proofs must be accumulated and assembled in quest of some evidential manifestation of the persuasive and indispensable motive which impelled the decedent to initiate the transfers at the chosen time.
An inceptive observation of the proofs is promptly monopolized by the conspicuous revelation that the decedent in December, 1935, at the age of seventy-one years, transferred cash and securities valued then at $734,488.02, and died on November, 1939, leaving a relatively scanty estate of approximately $14,500. In Squier v. Martin, supra, I professed the belief that it is injudicious to assume initially that every relatively large gift made by a donor of advanced age is made in contemplation of death and to survey the evidence solely from that point of view. There is no cogent reason to relinquish that conviction. Assuredly, the age of the donor and the proportional segment of his or her estate so donated are factors to be associated with all other relevant circumstances. In re Sacks,101 N.J. Eq. 709; 139 Atl. Rep. 53. All must be explored because all the pertinent factors, events and circumstances will the better clarify and embellish an exposure of the truth.
Joel S. Coffin evidently was an enterprising and prosperous business man. He died testate on March 11th, 1935, possessed of an estate in excess of three millions of dollars. During his life, he aided his wife, Harriet D. Coffin, in the acquisition of a financial competence of approximately $700,000. Mr. Coffin bequeathed to his widow, for and during her life, such portions of the net income of his estate "as she may require for her maintenance, health and personal comfort and pleasure, after she will have used for the same purposes all of the income received by her from her own property and investments after my decease." The corpus of his estate was devised and bequeathed, subject to a small annuity to his sister, to the testator's two sons, C.W. Floyd Coffin and Joel S. Coffin, Jr.
In December, 1935, Harriet D. Coffin made the following voluntary transfers of the contemporaneous values here stated: *Page 191 
C.W. Floyd Coffin, son .............................. cash $25,000.00
Joel S. Coffin, Jr., son ............................ " 25,000.00
Chas. H. Whittington, brother ....................... "
5,000.00 Ida M. Fincher, sister .............................. " 5,000.00
E. Frank Whittington, nephew ........................ " 5,000.00
Frederick Whittington, nephew ....................... " 5,000.00
Francis W. Fincher, nephew .......................... " 5,000.00
Issue of son, C.W.F. Coffin, grandchildren .... securities 329,744.01
Issue of son, Joel S. Coffin, grandchildren ... " 329,744.01
 ___________
 Total ........................................... $734,488.02

The donations in cash on December 19th, 1935, were absolute and unconditional transfers. The transfers beneficial to her grandchildren are evidenced by two trust indentures executed on December 20th, 1935. The obvious affiliation of all of these gifts creates the inescapable inference that all were originated by the identical incentive. Hence, an acquaintance with the distinctive features of the trust indentures is opportune.
The typical testamentary characteristics of trust indentures, however artistically contorted, do not always defy recognition. These two indentures in all aspects are twins, except that in one the trust fund is divided into three shares for the equal benefit of the three children of the decedent's son C.W. Floyd Coffin, and in the other the corpus is partitioned into five portions for the equal obtainment of the five children of her son Joel S. Coffin, Jr. It is at once observed that these transfers are not to be appropriately entitled present, absolute, unconditional and outright gifts for the immediate needs of the beneficiaries. The donor contemplated and expressly prescribed the eventualities governing the enjoyment of the income and principal by the beneficiaries in the future.
To elucidate: Each share is transmitted to the beneficiary according to the following specifications:
"(a) During the minority of the beneficiary of the part, the net income derived from the part shall be paid to the Individual Trustee, who shall use the same for the benefit of the beneficiary as he may deem advisable, the Bank Trustee being under no obligation to look to the application of any of the said income by the Individual Trustee;
"(b) During the four-year period commencing with the beneficiary's attainment of the age of twenty-one (21) years and ending with the *Page 192 
beneficiary's attainment of the age of twenty-five (25) years, the net income derived from the part shall be paid to the beneficiary in monthly installments;
"(c) Upon the beneficiary's attainment of the age of twenty-five (25) years, one-tenth (1/10) of the then principal of the part shall be paid to the beneficiary;
"(d) During the five-year period commencing with the beneficiary's attainment of the age of twenty-five (25) years and ending with the beneficiary's attainment of the age of thirty (30) years, the net income derived from the remainder of the part shall be paid to the beneficiary in monthly installments;
"(e) Upon the beneficiary's attainment of the age of thirty (30) years, one-sixth (1/6) of the remainder of the principal of the part shall be paid to the beneficiary;
"(f) During the four-year period commencing with the beneficiary's attainment of the age of thirty (30) years and ending with the beneficiary's attainment of the age of thirty-four (34) years, the net income derived from the remainder of the part shall be paid to the beneficiary in monthly installments;
"(g) Upon the beneficiary's attainment of the age of thirty-four (34) years, one-third (1/3) of the remainder of the principal of the part shall be paid to the beneficiary;
"(h) During the four-year period commencing with the beneficiary's attainment of the age of thirty-four (34) years and ending with the beneficiary's attainment of the age of thirty-eight (38) years, the net income derived from the remainder of the part shall be paid to the beneficiary in monthly installments; and
"(i) Upon the beneficiary's attainment of the age of thirty-eight (38) years, all of the remainder of the principal of the part shall be paid to the beneficiary."
Additional provisions enable the decedent's great-grandchildren and the children of her deceased brothers and sisters to receive shares of the trust fund upon the occurrence of future contingencies. Indeed, the plan is so elongated prospectively that it was considered prudent to legitimatize it by the declaration: "In no case shall any property be held under the provisions of this Indenture for a period extending beyond the life of the survivor of the Grantor's above named grandchildren, plus twenty-one years."
At the time of the creation of the trusts, the youngest of the decedent's grandchildren was about seven years old; the eldest had arrived at the age of twenty. It is accordingly demonstrative that the trust device was to have a predetermined and expectant efficiency during a span of thirty-one successive years, at which time, if living, the settlor would *Page 193 
be 102 years old. Did Mrs. Coffin expect, reasonably or otherwise, to attain that uncommon age, or was it her purpose to then bestow, provisionally, upon her young grandchildren, estates which would sustain them and their families in a future reaching far beyond her death?
It is acknowledged that Mrs. Coffin was an intelligent person, and that at the age of 71 her state of health was satisfactory. The time, however, during which the proposed trust indentures were discussed, prepared and executed is significant. Within the year, death had visited her husband and reminded her of its presence. A blow that crushes one's heart is not promptly forgotten. At what time in her life would thoughts of death be more likely to pervade her mind? True, death seems to choose its own time but as the years elapse, it is natural to suspect that death lurks more closely.
It has been repeatedly stated that the statute envelops every gift made when, while and because the donor contemplates his or her death as an event certain to occur eventually (although not apprehended to be imminent) and therefore makes the gift in substitution for an eventual testamentary transfer. Schweinler
v. Martin, supra.
The transaction viewed in its factual environment was probably the creation of the family circle. The two sons were executors and trustees of the father's large estate, and to whom upon their mother's death, the principal would pass. Mrs. Coffin realized that under the terms of her existing will, now that her husband had predeceased her, her estate would likewise be transported to the sons. Her husband and adviser had died. Ample provision had been made for the sons. Why not bestow her entire estate upon the grandchildren by means of a trust agreement, designate her two sons as the trustees, and thus in effect liberate herself entirely from all further business responsibilities and delegate to her sons the administration of both estates? Her sons would see that her financial needs were gratified notwithstanding the provisions of her husband's will restricting her income from his estate to that required in excess of her own. Such were probably her thoughts.
Obviously, there was no understanding, express or implied, *Page 194 
in the mind of Joel S. Coffin, Sr., that any part of his estate or the entire estate of Mrs. Coffin should be transferred by her to the grandchildren after his death. Cf. MacGregor v. Martin,supra; Plum v. Martin, supra. In Squier v. Martin, supra, the gifts released from taxation were absolute and consummate, made to dependent donees in a manner which did not manifest the characteristics of a testamentary plan. Moreover, that decedent did not divest himself of his own estate. In Kavanagh v.Kelly, supra, the sum total of all the transfers did not amount in value to scarcely more than ten per centum of the estate of a decedent who had been accustomed to bestowing valuable gifts upon deserving relatives and employees.
In the present case, the decedent's two sons and their families were not in need of financial assistance. One had annual earnings as high as $40,000. The transcript does not disclose the annual income of the son Joel Coffin, Jr., who has since died, but there is no intimation that his financial situation was insecure. Therefore, it is not evident that there was in December, 1935, any exigency or sumptuary pinch whatever to occasion immediate gifts of such magnitude.
And, yet, Mrs. Coffin resolved to irrevocably transfer her estate of $700,000, from which at three per centum she would receive an annual income of $21,000, and rely upon "such portion of the net income" from her husband's estate "as she may require for her maintenance, health and personal comfort and pleasure,after she will have used for the same purposes all of the incomereceived by her from her own property and investments * * *." Her annual expenditures were about $30,000.
If otherwise taxable, transfers do not escape taxation merely because made through the medium of trustees. In re Gemmell,123 N.J. Eq. 315; 197 Atl. Rep. 428; Central Hanover Bank and TrustCo. v. Martin, 129 N.J. Eq. 186, 189; 18 Atl. Rep. 2d45. The substance of the transfer rather than its form is impressive. In re Schlegel, 111 N.J. Eq. 324, 326;162 Atl. Rep. 651; reversed on other grounds, 111 N.J. Law 154;167 Atl. Rep. 752; In re Hollander, *Page 195 123 N.J. Eq. 52; 195 Atl. Rep. 805; Dommerich v. Kelly,supra.
A variety of desires or motives of gradational persuasibility perhaps co-operated in some degree to induce this decedent to make the inter vivos transfers. She, however, meditated upon the relinquishment of substantially her entire resources, a purpose normally accomplished by a will. Love and affection recommended the recipients. Two methods were available. In her situation she must have considered the advantages of each. Where an inter vivos gift is the result of a considered choice and is intentionally made in the place and stead of a testamentary disposition, it is taxable under the provisions of the statute. The trust indentures display the telltale pattern of a typical testamentary distribution for the future enjoyment of the designated beneficiaries. Affectio tuo nomen imponit operi tuo.
In the argument of this appeal, no distinction between the cash transfers and those in trust has been suggested. It has been assumed, and reasonably so, that all were creatures of the same intent and purpose.
The conclusion is that this decedent intended to accomplish by means of the donations and trust agreements, the transfer of her estate for the benefit of her sons and grandchildren who should have the maximum enjoyment of it after her death.
All other grounds of appeal were expressly abandoned at the argument by counsel for the appellant.
The inter vivos transfers were taxable as made in contemplation of death, and a decree will be advised in accordance with this conclusion. *Page 196