Our existing statutory law empowers the Director, Division of Taxation, State Department of Taxation and Finance, to impose a transfer inheritance tax upon the transfer of real or tangible personal property made by a resident in contemplation of death or intended to become operative and effective in the possession and enjoyment of the transferee at or after the death of the transferor. R.S. 54:34-1, c; N.J.S.A. 54:34-1, c. Where the tax is justifiably levied, the statute instructs the taxing authority to compute it upon "the clear market value" of the property transferred. R.S. 54:34-5; N.J.S.A. 54:34-5.
The representatives of the estate of Arthur Raynor Johnson, who died on October 31st, 1943, at his residence in Montclair, Essex County, New Jersey, desire me to determine whether in the circumstances disclosed by the present appeal, the Director properly or erroneously discharged those statutory duties. R.S.54:33-2; N.J.S.A. 54:33-2; R.S. 54:34-13; N.J.S.A. 54:34-13.
In Squier v. Martin, 131 N.J. Eq. 263; 24 Atl. Rep. 2d865, I gathered the reported decisions illustrative of transfers made in contemplation of death and also those exemplifying transfers intended to become operative at and after the death of the transferor. Perhaps it will be of some aid to the bar for me to congregate occasionally the citations of those decisions that have been subsequently rendered. The more recent decisions are: Kavanagh v. Kelly, 131 N.J. Eq. 398;25 Atl. Rep. 2d 547; Plum v. Martin, 132 N.J. Eq. 1;26 Atl. Rep. 2d 529; Dommerich v. Kelly, 132 N.J. Eq. 220;27 Atl. Rep. 2d 871; affirmed, 130 N.J. Law 542;33 Atl. Rep. 2d 893; affirmed, 132 N.J. Law 141; 39 Atl. Rep.
2d 30; Voorhees v. Kelly, 132 N.J. Eq. 230; 28 Atl. Rep.
2d 61; affirmed, 130 N.J. Law 61; 31 Atl. Rep. 2d404; affirmed, 131 N.J. Law 226; 35 Atl. Rep. 2d 895;Coffin v. Kelly, 133 N.J. Eq. 188; 31 Atl. Rep. 2d 186;
affirmed, 131 N.J. Law 241; 36 Atl. Rep. 2d 11; affirmed,133 N.J. Law 252; 44 Atl. Rep. 2d 29; Pennsylvania Co.,c., Annuities v. Kelly, 134 N.J. Eq. *Page 257 120; 34 Atl. Rep. 2d 538; Grell v. Kelly, 134 N.J. Eq. 593; 36 Atl. Rep. 2d 874; modified, 132 N.J. Law 450;41 Atl. Rep. 2d 122; Kelly v. Kelly, 134 N.J. Eq. 316;35 Atl. Rep. 2d 618; 135 N.J. Eq. 75; 37 Atl. Rep. 2d288; Bank of New York v. Kelly, 135 N.J. Eq. 418;38 Atl. Rep. 2d 899; Hagy v. Kelly, 135 N.J. Eq. 436;39 Atl. Rep. 2d 386; Ricardo v. Kelly, 136 N.J. Eq. 365;41 Atl. Rep. 2d 901; Lockwood v. Walsh, 137 N.J. Eq. 445;45 Atl. Rep. 2d 305; Avery v. Walsh, 138 N.J. Eq. 80;46 Atl. Rep. 2d 912; Ten Eyck v. Walsh, 139 N.J. Eq. 533;52 Atl. Rep. 2d 445; Creasey v. Zink, 140 N.J. Eq. 111.
Since all initial appeals in transfer inheritance tax cases are uniformly referred to the Vice-Ordinary of the Trenton vicinage, I have accordingly commented so frequently and repetitiously upon the state of the law and the cardinal elements and factors to be considered, that the time has probably arrived for me to proceed directly to the factual circumstances of the case at hand and assume that my discussions of those subjects in previous decisions have not fallen upon inattentive ears. I have resolved to pursue that course in deciding the present appeal.
The decedent, Arthur R. Johnson, was in reality the owner of all of the common capital stock of Arthur R. Johnson Co., Inc., a commercial enterprise incorporated in the year 1938. The business of the company was styled in trade nomenclature as a converter and exporter of textiles. The enterprise was relatively profitable, and the stock became correspondingly valuable. By means of an indenture bearing date November 27th, 1941, the decedent transferred 700 shares of the capital stock of the company to trustees for the future benefit of his wife, his children, their issue, and others, to which trust agreement I shall subsequently refer. The decedent retained at his death the ownership of 339 shares.
The respondent resolved that a transfer inheritance tax should be levied upon the inter vivos transfer in that in his judgment it was a gift made by the decedent in contemplation of death or intended to take effect in possession or enjoyment *Page 258 
at or after his death. The stock was appraised at $172.90 per share.
The present appeal projects two controversial issues. The appellants assert (1) that the tax assessed upon the intervivos transfer was unjustifiable; (2) that the appraisal value of the stock is excessive and exorbitant.
The transcript of the exhibits and other proofs provides the factual material to be explored in the consideration and ultimate determination of those issues. It is from a deliberate examination of the transcript that I have acquired and collected the following facts which seem to me to be somewhat fruitful of inferences relevant to the probable intent and purpose of the decedent in making the transfer. In Coffin v. Kelly, supra, I commented: "In general, a motive is a consideration which determines choice and becomes an incentive to undertake the accomplishment of some act. The inducement normally arises from the attractive and gratifying character of the consideration. Motives are frequently concealed or disguised. Often their detection is a perplexing task. The operation of human emotions cannot be reduced to definite and precise rules, but usually there are existing facts preceding, accompanying, surrounding and following the particular course of action from which the probable motive of the person can be logically and reasonably inferred."
The decedent was exceedingly proud of the success of his business undertaking, and he was ardently interested in its continued existence. In 1938 he clothed it with corporate immortality. In 1941 he selected from his portfolio approximately two-thirds of all of the outstanding capital stock of his company as the sole corpus of a trust to endure by its terms into the future.
In 1938 or 1939 the decedent lost the sense of sight in his left eye. In 1939 he began to experience occasional "dizzy spells" which his physician ascribed to "arterial changes." Significantly he died in 1943 from a "cerebral hemorrhage due to arteriosclerosis." It was during that interval (on November 27th, 1941) that he executed the trust agreement.
The treasurer of the company describes the decedent as having *Page 259 
been an intensely tax-conscious person. He relates that at his numerous conferences and luncheon engagements with the decedent "taxation as a whole was discussed all the time," "all types." Is it likely, then, that inheritance taxes eluded the contemplations of the decedent? It is not a requisite of taxability that contemplation of death should have been the sole and only motive for the transfer.
In November, 1941, the decedent in the sixty-sixth year of his life would naturally be in a disposing mind. The character of the gift or transfer always deserves attention in these cases. Approaching the question impartially, one must pause to consider whether the transfer of such a major part of his estate at that age was in truth intended by the donor to vest instantly in the named beneficiaries the immediate enjoyment of the blessings of the gift. What occurred in the present case? Although the decedent divulged to his wife in a somewhat shadowy manner that he had executed a trust indenture, he refrained from informing her definitely of its terms and provisions, and he abstained from imparting to her his reason for the creation of the trust. Neither his son nor his daughter, who are also beneficiaries, acquired any knowledge of the trust until after the death of their father.
Moreover, although the company, the stock of which he donated to the beneficiaries of his trust, had earned and declared dividends in previous years, and still continued to earn profits equivalent to and, indeed, in excess of those of the previous years, not a single dividend was declared and came into the hands of the trustees of his inter vivos trust for the benefit of his donees during the remaining lifetime of the decedent. He obviously retained the control of the financial affairs of the company.
Our statute envelops all transfers which in their intrinsic character and intended effect are merely substitutes for testamentary dispositions. A gift is taxable if it is made as a result of that contemplation of death which induces a decedent, aware of a choice, intentionally to make an inter vivos gift in the place and stead of a testamentary disposition. It must be acknowledged that the trust agreement made by this *Page 260 
decedent in the present case is manifestly of a testamentary type. It is not evident that any one of the beneficiaries of the trust was in need of financial aid, which would have influenced the decedent to make an immediately beneficial gift. Indeed, it is revealed that the wife of the decedent, the life beneficiary of the trust, had an independent personal income of her own. The confirmatory fact is that no one received any beneficial enjoyment of the trust during the lifetime of the decedent, although he continued his previous sovereignty and lordship over the financial affairs of the company.
Obviously the transfer was not intended by the decedent to be an immediately effective gift conferring upon the donees the instantaneous and successive enjoyment of the corpus and income of the trust. The only motive the appellants can conjecture that actuated the decedent in the origination of the trust was a desire to avoid income taxes. That notion seems to be pulverized under the pressure of the actual occurrences plus the intrinsic character of the transfer.
If it is supposed that there is a paucity or absence of credible and persuasive proof concerning the impelling motive of the decedent, our statute ordains that "a transfer by deed, grant, bargain, sale or gift made without adequate valuable consideration and (as here) made within two years prior to the death of the grantor, vendor or donor of (as here) a material part of his estate or (as here) in the nature of a final disposition or distribution thereof, shall, in the absence of proof to the contrary, be deemed to have been made in contemplation of death within the meaning of paragraph (c) of this section." R.S. 54:34-1; N.J.S.A. 54:34-1.
If, then, the existing state of the proofs is indefinite, the statutory presumption must be accorded its appropriate weight and respect. The conclusion is that the transfer of 1941 was taxable.
The remaining subject of discord and dispute relates to the alleged excessive valuation of the stock of the company for the purposes of tax computation.
Initially it is to be realized that there has never been a sale of any of the capital stock of the corporation. Actually *Page 261 
the decedent was the owner of all of it. In undertaking to determine the value of the shares as of the date of the decedent's death, the respondent has utilized, without change, the business balance sheets and profit and loss statements supplied by the appellants which embrace the period from the formation of the company in 1938 to and after the death of the decedent.
The corporate earnings during the entire period were considered. The average annual profit earned by the company (1938 to 1944, inclusive) was found to be $18,239.32. This average profit the respondent capitalized at the rate of 10.2% resulting in a per share valuation of $172.10. Tersely stated, the insistence of the appellants is that the earnings ought to have been capitalized per share for each year instead of capitalizing the average of the corporate net annual profit, and that the rate of capitalization should be 15%. Moreover the appellants propose that the "abnormal earnings" of the year 1941 should be entirely ignored. The suggestions that the business of the company was of a hazardous nature and that the death of the decedent adversely affected the stability of the business are not sustained by the evidence. The financial statement for the year 1944 and the testimony of the treasurer, Mr. Nugent, negative these representations. Incidentally, it is noticed that good will attributable to the energies and other business qualifications of the decedent was not in any measure included in the appraisal of the stock.
The obligation and objective of the respondent was to ascertain the "clear market value" of the stock. He did not reject to the disadvantage of the appellants any relevant evidence tending to prove it. Lacking proof of current market value, he analyzed the balance sheets and profit and loss statements of the company, and then resorted to the capitalization of earnings method as the most reliable evidence of "clear market value." In the circumstances the respondent was justified in pursuing that course. Cf. In re Moore, 104 N.J. Eq. 400; 145 Atl. Rep. 727;Renwick v. Martin, 126 N.J. Eq. 564, 604; 10 Atl. Rep. 2d293; Plum v. Martin, supra.
The tax department is a well informed and experienced *Page 262 
agency in its special field of governmental activities. Its function in determining the fact of value, although subject to review, is closely analogous to the fact-finding province of a jury. Where an approved method of appraisal is properly applied to all of the available evidence and there is no error in law, the conclusion of the taxing authority in fixing value is entitled to impressiveness.
I am not persuaded that in the present case the adoption by the respondent of a capitalization rate of 10.2% instead of 15% was unjustified and unreasonable.
A decree will be advised in conformity with these conclusions. *Page 263