The notable personage in the authentic legend of this case is one David B. Mills, a former resident of Montclair, Essex County, New Jersey, who died testate on February 25th, 1944. In the springtide of his business career he is said to have encountered financial adversities which not only introduced him to the vexations and, perhaps, mortifications of such misfortunes, but seem to have moistened his heart with a realistic perception and consciousness of those distressing pressures that fall upon the indigent.
Those recollections remained thereafter fadelessly in his memory. He eventually acquired millions of dollars. As if in reward for his continuous generosity to others, life was munificent to him. He died at the age of 86.
The records of his philanthropy and benevolence can be traced uninterruptedly to the year 1908. His charity promptly became known and, as in such cases, there was soon "a hard-beaten road to his house." The worthiness of each applicant necessitated some inquiry and in that pursuit, which progressively increased in volume, Mrs. Mills was his devoted collaborator. In the death of Mrs. Mills in 1931 *Page 403 
he sustained the irreparable loss of her faithful interest and co-operation, but his inclination to continue his philanthropic activities became no less resolute.
Increasing experience in the practicalities of such undertakings caused him to entertain with greater favor the impression that his charities could be more efficiently and beneficially dispensed by enlisting the aid and judgment of some competent and trustworthy associates. At the close of the year 1934 his donations had already exceeded a total of $1,250,000. Hence, in 1935 he in association with four of his acquaintances initiated the incorporation of a non-profit organization, the objects of which were entirely charitable in purpose and the corporate existence of which was limited to 20 years. It was given the corporate title "The Davella Mills Foundation." The name "Davella," a composite of the Christian names of Mr. Mills and his deceased wife, reverberates a sentimental medley.
The purposes for which the corporate body was formed are exhibited by the following quotation from its charter:
"II. That the purposes for which the corporation is formed are, to receive, hold, care for, invest in and operate real and personal property and to use and distribute from time to time all the income and all principal, as well, which it shall receive in charitable gifts, to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, or by relieving their bodies from disease, suffering or constraint, or by assisting them to establish themselves in life; or by erecting or maintaining public buildings or works; or by otherwise lessening the burdens of government. Such funds may be used and distributed for all of said purposes, or for any one or more within or without the State of New Jersey. It is the intent and purpose that the said corporation shall be organized and operated exclusively for religious, charitable, scientific, or educational purposes, within the classification of legal charities and no part of the net earnings nor of the principal shall inure to the benefit of any private shareholder or individual and no substantial part of the activities of such corporation, or of any recipient of its funds, shall be to carry on propaganda or otherwise to attempt to influence legislation."
On May 31st, 1935, Mr. Mills executed an instrument evidencing his first contributions to the Foundation, comprising an assignment of 50,000 shares of the common stock of *Page 404 
General Motors Corporation and a check for $12,500 representing the quarterly dividend thereon payable June 12th, 1935, in trust for the following uses:
"* * * to take and hold the same and collect the income and the principal when due, to invest and reinvest the principal, until the distribution thereof, in such investments as are legal for investments of the funds of Savings Banks in New Jersey, but with power in the discretion of its trustees to retain the investments herein transferred, subject only to the limitations contained in its certificate of incorporation, and to apply the income andthe principal in the discretion of the trustees of said corporation to any or all of the general charitable purposes set forth in the certificate of incorporation of the said THE DAVELLA MILLS FOUNDATION in the manner and under the safeguards and limitations and pursuant to the corporate powers therein set forth." (Italics mine.)
The decedent thereafter made annual donations to the Foundation with similar instructions until the year of his death. His intervivos gifts to that donee are represented by the taxing authority to aggregate the sum of $2,955,681.16. The departmental Division of Taxation through its bureau has resolved that all those donations are taxable as inter vivos transfers made by the decedent in contemplation of death. R.S. 54:34-1, c,N.J.S.A.
The following excerpts extracted from the respondent's brief engage my attention:
"As has been noted herein, these gifts extended over a period of nine years and the respondent's finding encompasses all of the transfers made during that time and, for the purposes of this argument will be treated as a homogeneous series of transfers
since they all appear to have been motivated by the same considerations and were made to the one beneficiary." (Italics mine.)
 * * * * * * *
"The respondent has determined that the facts and circumstances surrounding the creation of the Davella Mills Foundation, and the making of the various gifts thereto are indicative of a state of mind on the part of the decedent which in the ordinary course ofevents, would have led him to make a testamentary disposition of his property." (Italics mine.) *Page 405 
It must be at once acknowledged that gifts inter vivos which are in reality absolute, consummate, and immediately effective are not taxable by the statute unless they were made by the donor in contemplation of death, and the determinant of their taxability as transfers in contemplation of death is the motive, intent, and purpose of the transferor. Squier v. Martin,131 N.J. Eq. 263; 24 Atl. Rep. 2d 865, and cases therein cited.
The intent and purpose which motivated this decedent in his creation of the Foundation and his generous contributions to its fund cannot be described with greater lucidity than has been done by the witness Paul H. Hudson whose testimony, abundantly corroborated, I adopt and here transcribe:
[The transcription of the testimony of this witness, although embodied in the filed opinion, is omitted from this published report at the direction of the Vice-Ordinary.]
The personal qualities of the transferor, his habits, propensities, and conduct both prior and subsequent to the transfers, as well as the intrinsicalities of his inter vivos
gifts are, inter alia, often illuminative factors in the effort to detect "the motivating, impelling cause" and "the controlling purpose" of such gifts. Kavanagh v. Kelly, 131 N.J. Eq. 398;25 Atl. Rep. 2d 547; Dommerich v. Kelly, 132 N.J. Eq. 220; 27 Atl. Rep. 2d 871; affirmed, 130 N.J. Law 542;33 Atl. Rep. 2d 893; affirmed, 132 N.J. Law 141;39 Atl. Rep. 2d 30.
In Coffin v. Kelly, 133 N.J. Eq. 188; 31 Atl. Rep. 2d186; affirmed, 131 N.J. Law 241; 36 Atl. Rep. 2d 11;
affirmed, 133 N.J. Law 252; 44 Atl. Rep. 2d 29, I ventured to define in general a motive to be a consideration which determines choice and becomes an incentive to undertake the accomplishment of some act. The inducement normally arises from the attractive and gratifying character of the consideration.
This decedent was evidently a gracious, generous, sympathetic, and benevolent person who by his natural inclinations derived gratification during his life in devoting a surplusage of his capital and income to the promotion of the physical, *Page 406 
mental, financial, and spiritual comfort of others. Where, pray tell me, is there any preponderance of evidence to justify me in declaring that the benevolence of this decedent, originating in 1908 and enduring persistently until his death in 1944, was intended by him to be a "makeshift" employed throughout that span of time to effectuate indirectly or evasively a purpose normally testamentary in character?
I infer from the respondent's brief that the advanced age of the decedent, the substantial value of the donations, and the large amount of transfer inheritance taxes involved were influential elements in recommending the feasibility of imposing the assessment and inviting a judicial determination of its propriety.
Yes, the decedent was 77 years of age when he established the Foundation in 1935, but he continued to be in an extraordinarily favorable state of health until shortly before his death. Suffice to say on this point that the evidence does not signify that the idea of eventual death intruded to exert a dominant influence upon his intentions and purposes in perpetuating his inveterate charitable activities.
A comparison of his gifts with the amount of his current income and capital resources is not significantly helpful in the present case. He retained an ample income (for example, 1936 net income $219,815), and he died possessed of an estate in excess of $3,500.000.
The gifts, except restricted to charitable purposes, were otherwise unqualified and irrevocable. They were immediate, complete, and available for possession and enjoyment by the beneficiaries during the life of the donor. Such an accomplishment could not have been attained by means of a testamentary disposition. Anent transfers of ante mortem
interests, see Cairns v. Martin, 130 N.J. Eq. 313;22 Atl. Rep. 2d 415.
The disclosure that the decedent in recent years has calculated the amount of his charitable donations in accordance with the maximum percentage of his income thereby exempt or deductible from taxation is not tax evasion; it is legitimate tax avoidance, encouraged rather than deprecated by our federal legislation. *Page 407 
Tax consciousness, like death consciousness, becomes significant in these cases only in proportion to its degree. Cf.Avery v. Walsh, 138 N.J. Eq. 80; 46 Atl. Rep. 2d 912;Johnson v. Zink, 140 N.J. Eq. 255; 54 Atl. Rep. 2d 123;Fidelity Union Trust Co. v. Walsh, 141 N.J. Eq. 181.
I conclude that the taxability of the specified inter vivos
transfers of the decedent is not adequately sustained by the evidence, and a decree directing an annulment of the assessment levied upon them will be advised.
 THE BLOCKAGE RULE.
The rule or principle, so denominated, appertains to the process of determining the value of large blocks of corporate stock for gift and estate tax purposes. It originates and rests basically upon the postulate that a large block of stock cannot be marketed as readily and as advantageously in price as can a few shares. Representatives of estates having a large quantity of the stock of a particular company in their portfolios advocate the application of the rule because it normally operates to reduce a valuation founded conformably on exchange quotations and thus diminishes tax liability. It would be inaccurate to intimate, however, that the rule impugns either the usefulness or the authenticity of market quotations. It is more fitting to state that it does project the question whether such quotations constitute demonstrable proof of the true taxable value of such large blocks of stock.
Departmental recognition and occasional adoption of the rule has not been of a passive and submissive character. Prior to the recent amendments, the estate tax regulations of the federal revenue department ordained that value "is not to be determined * * * by an estimate of what a whole block or aggregate would fetch if placed upon the market at one and the same time," and "the size of holdings of any security to be included in the gross estate is not a relevant factor and will not be considered in such determination." Reg. 79 (1936 ed.), Art. 19(1);Reg. 80 (1934 ed.), *Page 408 Art. 13(3); 1937 Ed., Art. 10(c). Cf. Reg. 79 (1936ed.), Art. 19(3). Changes, estate tax regulations, T.D.4902, C.B. 1939-1, p. 325; gift tax regulations, T.D. 4901,C.B. 1939-1, p. 341.
In 1936 the blockage rule was unsuccessfully advocated by an appellant in this court in Spalding v. Thayer Martin, 119 N.J. Eq. 603; 183 Atl. Rep. 281, to which decision I shall subsequently revert. And so the taxpayers' incursions slowly but persistently continued without much impressive and eventful advancement until the decision in Helvering v. Safe Depositand Trust Company of Baltimore (C.C.A., 4th, 1938),95 Fed. Rep. 2d 806, in which it was declared that the circumstance that a large block of stock cannot be marketed and converted into money as readily as a few shares is a "pregnant fact" which the taxing authorities ought not to ignore.
I have undertaken to assemble the cardinal arguments, pro andcontra, relative to the full or limited adoption or rejection of the rule as I have harvested them from the reported decisions and from other informative sources. I present them only in a summarized resemblance.
The taxing authorities have defended the conviction that if an article is commonly traded in on an open market, and there is such a market on the crucial valuation date, the prices current in such market will be regarded as the fair market value of the article; that the shares of a corporate stock are uniformly of equal value and that the value of any number of shares, however large, is merely a matter of mathematical calculation when once the value of a single share is established; that to appraise precisely the same kind of property held by an owner in a small quantity at a different value from that ascribed to it in the hands of a large owner is to make "one rule for the rich and another for the poor" (Bingham's Administrator v.Commonwealth, 196 Ky. 318; 244 S.W. Rep. 781); that the fair market value of shares cannot be properly ascertained upon the premise that the large block of stock is to be forced on the market at one time: just as liquidating a large block in a single day would necessitate some sacrifice, so the buying of such a block at any *Page 409 
one time would require payment of a premium; that banks, trust companies, insurance companies, trustees do not in valuing their security portfolios make discounts in market valuations because of the size of the holdings of particular securities; that any fee or charge to be occasioned by the actual and immediate conversion of the stock into cash appertains to an administration expense rather than to the fair market value of the asset (Crinkshank v. Commissioner, 9 T.C. 162); and that the blockage rule introduces practical difficulties such as the size of the block to cause and justify the invocation of the rule, the variations of discounts between large and exceptionally large blocks, and the extravagance of proofs thereby required.
The taxpayer in such situations has persistently contended that valuations for tax purposes should be founded upon realities as revealed by competent proof rather than upon a servile adherence to an immutable and undeviating formula; that to hold that the value of a large block of corporate stock, for which there is no market, must be determined at the same value per share as that for which a few shares were sold and for which there was a market, without regarding the surrounding factors which plainly affect the value is, says he, supported by neither logic nor reason; that to offer for immediate sale on the Stock Exchange an exceptionally large block of stock will inevitably tend to demoralize the market; that it is a matter of common knowledge that the value of any product or commodity is governed by the measure of supply and demand, and that where the former far exceeds the latter, it has a depressing effect upon value — so with shares of corporate stock; that the so-called willing buyer or dealer is aware of that factor and to interest him it becomes necessary to sell the stock comprising the block at prices somewhat below the market quotations by methods known as "Special Offering" or "Secondary Distribution."
I pause here to explain that a "Special Offering," as I understand it, is a special handling of a block of stock on the New York Stock Exchange, subject to the rules of the Exchange Nos. 490 to 497, inclusive. It is a fixed price offering by one or more members of the Exchange acting for his *Page 410 
or their account or for the account of one or more other persons, for the sale of a block of a listed security through the facilities of the Exchange at a price not in excess of the last sale of such security or the current offer of such security in the regular market on the floor of the Exchange, whichever is the lower, but not lower than the current bid for such security in such market, whereby the offeror agrees to pay a special commission to such member or member firms as may accept all or any part of such offering for the account of his or their customers. A "Secondary Distribution" is also a special handling of a block of stock by a broker or dealer which by stipulation is not subject to the rules of the Exchange.
It may be serviceable to indicate some of the authorities from among the many that I have consulted, which support my exposition of the subject of the "blockage rule" and which sustain my present conclusion that although its ultimate locus standi in the field of tax valuation has not yet been finally determined, yet it has achieved sufficient recent judicial respect to be regarded in appropriate cases as a material factor entitled to be considered among other relevant facts and circumstances in determining value for the computations of transfer inheritance taxes on decedent's estates under our statute. Du Pont v.Commissioner, 2 T.C. 246; Avery v. Commissioner, 3 T.C. 963;Helvering v. Safe Deposit and Trust Co., 95 Fed. Rep. 2d806; Commissioner v. Shattuck, 97 Fed. Rep. 2d 790;Page v. Howell, 116 Fed. Rep. 2d 158; Helvering v.Maytag, 125 Fed. Rep. 2d 55; certiorari denied,316 U.S. 689; Phipps v. Commissioner, 127 Fed. Rep. 2d 214;certiorari denied, 317 U.S. 645; Commissioner v. Stewart'sEstate, 153 Fed. Rep. 2d 17; Standish v. Commissioner
(June 19th, 1947), 8 T.C. ; earlier cases: Rice v. Eisner,16 Fed. Rep. 2d 358, 361; certiorari denied,273 U.S. 764; Heiner v. Crosby, 24 Fed. Rep. 2d 191; In reClabby's Estate, 308 Pa. 287; 162 Atl. Rep. 207; Cleary v.Higley, 154 Misc. (N.Y.) 158, 166; 277 N.Y. Supp. 63, 73;
affirmed, no opinion, 246 App. Div. 698; 284 N.Y. Supp. 989.
Other sources: Peters, The Fair Market Value of Blocks of Stock,17 Taxes 17; Harris, Gift *Page 411 Taxation in the United States 81, 82-3; Paul, Federal Estate andGift Taxation 1280 § 18.27.
The present appellants lay before me the so-called blockage attribution in their criticism of the value ascribed by the respondent to the 53,000 shares of General Motors Corporation retained and owned by the decedent at his death.
Our legislature in a style properly to be regarded as mandatory directed that transfer inheritance taxes shall be computed upon the clear market value of the property transferred. R.S.54:34-5, N.J.S.A. The respondent in obedience to that mandate evidently ascertained, inter alia, the lowest price per share at which the stock of that company actually sold on the date of the decedent's death, namely $54.875 per share, and utilized mathematically that unit price in determining the total valuation of the block of stock. Grell v. Kelly, 132 N.J. Law 450, 451;41 Atl. Rep. 2d 122. Hence the appellants in this appeal, after a lapse of some years, have come upon an available opportunity to cultivate (or endeavor so to do) a more hospitable consideration of the blockage theory by our State Tax Department.
I have previously herein expressed the opinion that the enormity, mass, and volume of the stock ought in my judgment to be accorded deliberate consideration by the taxing bureau in the determination of its clear market value, but I am disinclined to recognize in all such cases the so-called blockage valuation as a dominant, much less a decisive or exclusive criterion, of taxable value. I prefer to recommend that the tax department thus enjoined and empowered to appraise and evaluate taxable assets should receive and consider relevant and competent evidence disclosing all of the pertinent conditions, qualifications, modifications, and exceptional circumstances in the given case which are modernly observed under the prevailing standards of business practices. Maass v. Higgins, 312 U.S. 443;61 S.Ct. 631; 85 L.Ed. 940: 132 A.L.R. 1035.
There is no proof in the record submitted to me in the instant appeal that the respondent rejected any evidence sought to be adduced by the appellants, or utterly ignored the significance, if any, of the large volume of the particular *Page 412 
stock to be appraised. Nor can I resolve that an appraisal at the published market price of widely distributed securities sold daily on the floor of an exchange is erroneous in law. Grell v.Kelly (Supreme Court), supra.
Therefore, the question of present concern is whether the valuation of the 53,000 shares implicated in this appeal is erroneous in fact. Kellogg v. Martin, 130 N.J. Eq. 338, 343;22 Atl. Rep. 2d 430. Its solution obliges me to ponder the degree of prestige to be attributed in the instant case to the opinion of this court in the Spalding Case. Stare decisis et nonquieta movere.
It is distinctly obvious that the learned Vice-Ordinary in his opinion in the Spalding Case (at pp. 608 et seq.) definitely disapproved in principle the application of the blockage rule to valuations made in pursuance of our statute. He stated: "This argument is unsound. It is undoubtedly true that if the executors had placed this entire block on the market on the day of decedent's death, the price would have broken to approximately nothing. But the executors were not required to sell that block on that day. The statute says nothing about selling; the statute speaks only of the fair market value on the day of death."
It therefore seems evident that of the two antithetical conceptions of the blockage rule, this court has already preferred the unfavorable view. While I have never subscribed to the proposition that our courts must abjectly submit to an unqualified enslavement and subserviency to early precedents, yet some admonition may still be found in the declaration of Chancellor Kent: "When a rule has once been deliberately adopted and declared, it ought never to be disturbed, by the same court,except for very urgent reasons and upon a clear manifestation oferror." (Italics mine.) Kent Com. 475; Creasey v. Zink,140 N.J. Eq. 111; 53 Atl. Rep. 2d 715.
In the local field of statutory transfer inheritance taxation, the decisions of the federal courts are not controlling.
Nevertheless, I have looked behind the scenes and examined the evidence which the appellants have put forth to support the alleged supremacy of the blockage rule in its application to the valuation here impugned. It consists of a letter addressed *Page 413 
to Montclair Trust Company by a stock exchange firm of brokers that in order to distribute the 53,000 shares, "we could have required a discount of $1.00 per share from the last sale at the time of offering;" an affidavit from an experienced member of the New York Stock Exchange which expresses his personal opinion that the block of stock could not have been sold on the Exchange "in the regular way in the last few days of the Month of February,1944, without causing a considerable drop in the price of the stock before it was all sold," (italics mine); and a schedule disclosing the price range and volume of such shares sold during the brief period between February 2d 1944, and March 6th, 1944. I note that in excess of 78,000 shares were sold on the market during that interval at a price range, high 56, low 53 3/4.
The evidence adduced by the appellants is too meager and too thin in its informative stature to demonstrate the propriety, much less the cogency, of applying the blockage rule, if the rule were now to be recognized. Requisite proofs must embrace information concerning such matters as the amount of the outstanding stock, the number of shareholders, the recorded number of shares traded in each week or month over a much more extended span of time, the favorable or unfavorable technical position of the company, the attractive or unattractive state and trend of the market, c., all of course within reasonable proximity in point of time to the essential date.
A decree will be advised nullifying the assessment levied upon the inter vivos transfers, and sustaining and confirming the assessment upon the corporate stock involved in the testamentary disposition. *Page 414